DAVID A. HUBBERT
Deputy Assistant Attorney General

AMY MATCHISON
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 683
Washington, D.C. 20044
Telephone:       (202) 307-6422
Fax:                 (202) 307-0054
Email:   Amy.T.Matchison@usdoj.gov
            Western.Taxcivil@usdoj.gov

*Attorneys for United States of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona, | Case No. 2:24-cv-00355-PHX-GMS |
| Plaintiff, | **UNITED STATES' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| United States Internal Revenue Service; Daniel I. Werfel, in his official capacity as Commissioner of the United States Internal Revenue Service; the United States Department of Treasury; Janet L. Yellen, in her official capacity as Secretary of the United States Department of Treasury; and the United States of America, | |
| Defendants. | |

# TABLE OF CONTENTS

**I.   INTRODUCTION** ................................................................................................ 1

**II.  BACKGROUND** ................................................................................................ 2

**III. ARGUMENT** ...................................................................................................... 5

  A.   ARIZONA IS NOT LIKELY TO SUCCEED ON THE MERITS. ............................ 5

    *1.*   *Arizona lacks standing.* ........................................................................ 5

    *2.*   *Arizona has failed to establish a waiver of sovereign immunity.* ........................ 8

    *3.*   *There is no waiver of sovereign immunity under the APA.* ........................ 9

    *4.*   *The AIA and DJA bar Arizona's complaint.* ........................................ 10

    *5.*   *The IRS's administrative position is not arbitrary and capricious.* ................. 13

    *6.*   *The payments Arizona made in 2023 are includable in income.* ....................... 14

      a)   Arizona's payments are not refunds of state taxes paid. ............................... 14

      b)   Arizona's payments do not qualify for the general welfare exclusion. .......... 15

      c)   Arizona's payments do not qualify as disaster relief. .................................... 17

  B.   ARIZONA WILL NOT SUFFER IRREPARABLE HARM. ...................................... 18

  C.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST DO NOT SUPPORT A PRELIMINARY INJUNCTION. ........................................................................... 20

**IV. CONCLUSION** ................................................................................................ 21

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ................................................................ 5

*Am. Bicycle Ass'n v. United States* (*In re Am. Bicycle Ass'n*),
  895 F.2d 1277 (9th Cir. 1990) .............................................................. 12

*Arford v. United States*,
  934 F.2d 229 (9th Cir. 1991) ................................................................ 9

*BakeMark USA LLC v. Pastis*,
  No. CV-23-02674-PHX-SMB, 2024 WL 810635 (D. Ariz. Feb. 27,
  2024) ...................................................................................................... 18

*Baur v. Veneman*,
  352 F.3d 625 (2d Cir. 2003) ............................................................ 6

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................ 9

*Bob Jones Univ. v. Simon*,
  416 U.S. 725 (1974) ...................................................................... 11

*Brock v. Pierce Cty.*,
  476 U.S. 253 (1986) ...................................................................... 21

*Caterpillar Tractor Co. v. United States*,
  589 F.2d 1040 (C. Cl. 1978) ......................................................... 10

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ........................................................................ 18

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................ 8

*Clintwood Elkhorn Mining Co.*, 553 U.S. 1 (2008) ............................. 10

*Colorado River Indian Tribes v. Town of Parker*,
  776 F.2d 846 (9th Cir. 1985) ........................................................ 19

*Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol &
  Tobacco Tax & Trade Bureau*,
  843 F.3d 810 (9th Cir. 2016) ................................................... 12, 13

*De Masters v. Arend*,
  313 F.2d 79 (9th Cir. 1963) ............................................................ 9

*Dunn & Black, P.S. v. United States*,
  492 F.3d 1084 (9th Cir. 2007) ........................................................ 9

*Enochs v. Williams Packing & Navigation Co.*,
  370 U.S. 1 (1962) .................................................................... 11, 12

*Fairbanks N. Star Borough v. United States Army Corps of Engineers*,
  543 F.3d 586 (9th Cir. 2008) .......................................................... 9

*Florida v. Mellon*,
  273 U.S. 12 (1927) .......................................................................... 7

*Gallo Cattle Co. v. U.S. Dep't of Agric.*,
  159 F.3d 1194 (9th Cir. 1998) ........................................................ 9

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) ........................................................ 21

*Hodge v. Dalton*,
  107 F.3d 705 (9th Cir. 1997) .......................................................... 8

*Hughes v. United States*,
  953 F.2d 531 (9th Cir. 1992) ..................................................... 9, 19

*J&G Sales Ltd. v. Truscott*,
  473 F.3d 1043 (9th Cir. 2007) ...................................................... 13

*King v. Saddleback Junior Coll. Dist.*,
  425 F.2d 426 (9th Cir. 1970) .......................................................... 1

*Lopez v. Brewer*,
  680 F.3d 1068 (9th Cir. 2012) ........................................................ 5

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................................ 6

iii

*Maines v. Comm'r*,
    144 T.C. 123 No. 8 (2015) .................................................................. 14

*Maryland v. Louisiana*,
    451 U.S. 725 (1981) ............................................................................ 6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) ............................................................................ 13

*Munaf v. Geren*,
    553 U.S. 674 (2008) ............................................................................ 1

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1987) .......................................................... 12

*New York, et al., v. Yellen*,
    15 F.4th 569 (2d Cir. 2021) ................................................................ 7

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................ 5

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976) ........................................................................ 6, 7

*Sampson v. Murray*,
    415 U.S. 61 (1974) ............................................................................ 19

*San Luis & Delta-Mendota Water Auth. V. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ............................................................ 13

*Schmier v. United States*,
    279 F.3d 817 (9th Cir. 2002) .............................................................. 6

*Shelby Cnty., Ala. v. Holder*,
    570 U.S. 529 (2013) .......................................................................... 19

*South Carolina v. Baker*,
    485 U.S. 505 (1988) .......................................................................... 20

*South Carolina v. Regan*,
    465 U.S. 367 (1984) ............................................................ 11, 12, 13

*Texas v. United States*,
    300 F. Supp. 3d 810 (N.D. Tex. 2018) ............................................ 11

*Tucson v. City of Seattle*,
    91 F.4th 1318 (9th Cir. 2024) ............................................................ 8

*U.S. Army Corps of Engineers v. Hawkes Co.*,
    578 U.S. 590 (2016) .......................................................................... 10

*United States v. Burke*,
    504 U.S. 229 (1992) .......................................................................... 14

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................ 5

*Washington Env't. Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013) ............................................................ 8

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................ 5

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992) ............................................................................ 7

**Statutes**

26 U.S.C. § 61 ................................................................................ 4, 5, 14, 15

26 U.S.C. § 139 .......................................................................................... 17

26 U.S.C. § 165(i)(5)(A) ............................................................................ 17

26 U.S.C.§ 6041(a) ................................................................................ 8, 18

26 U.S.C. § 6050E ..................................................................................... 18

26 U.S.C. § 6213(a) ................................................................................... 11

26 U.S.C. § 7422 ........................................................................................ 10

26 U.S.C. § 7604 ........................................................................................ 11

28 U.S.C.§ 1331 ........................................................................................... 9

28 U.S.C.§ 1340 ........................................................................................... 9

28 U.S.C. § 1343 ........................................................................................... 9

28 U.S.C. § 1346(a)(1) ................................................................................ 10

Administrative Procedure Act (5 U.S.C. § 701 *et seq.*) ......................... 9, 10, 13

Anti-Injunction Act (26 U.S.C. § 7421) ............................................... *passim*

Declaratory Judgment Act (28 U.S.C. § 2201) ..................................... *passim*

National Emergencies Act (50 U.S.C. § 1601 *et seq.*) ................................... 2

Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. § 5121
   *et seq.*) ................................................................................................. 17

**Other Authorities**

CCA 200908025 .......................................................................................... 15

Notice 2002-76, 2002-2 C.B. 917 ............................................................... 17

Notice 2023-56, 2023-38 I.R. ..................................................................... 14

Rev. Rul. 70-86, 1970-1 C.B. 23 ................................................................ 14

Rev. Rul. 76-395, 1976-2 C.B. 16 .............................................................. 15

Rev. Rul. 78-170, 1978-1 C.B. 24 .............................................................. 15

Rev. Rul. 2005-46, 2005-2 C.B 120 ........................................................... 15

Treas. Reg. § 1.6041-1 .................................................................................. 8

v

## I.     INTRODUCTION

The IRS often provides it views on novel and complex tax issues to help taxpayers take accurate positions on their returns. Taxpayers won't always agree with the IRS's views, and Congress has provided multiple judicial remedies to resolve those disagreements. This case presents one such disagreement regarding whether payments the State of Arizona made to a subset of its citizens in 2023 should be included in income. But Arizona seeks to bypass statutory remedies and accelerate relief through the "extraordinary and drastic" remedy of a preliminary injunction that would not preserve the status quo, but instead impose confusion on Arizona taxpayers and an unworkable mandate on the IRS just as this year's filing season is drawing to a close. *Munaf v. Geren*, 553 U.S. 674, 689 (2008); *King v. Saddleback Junior Coll. Dist.*, 425 F.2d 426, 427 (9th Cir. 1970). The problem for Arizona is that its request finds little support in the law. The Court should maintain the status quo and deny Arizona's motion.

This practical approach also matches the legal reality that Arizona is not entitled to a preliminary injunction. Arizona has not met its burden to show it will likely succeed on the merits, that it is likely to suffer irreparable harm, or that the balance of equities and public interest are in its favor. In particular, Arizona is not likely to succeed on the merits because there are threshold jurisdictional issues barring this suit. Arizona has failed to establish standing to sue in its own right. Arizona has also failed to establish a waiver of sovereign immunity. The complaint violates the Anti-Injunction Act ("AIA") and the Declaratory Judgment Act ("DJA"), which broadly prohibit suits seeking injunctive and declaratory relief from the application of federal tax laws. On the merits, Arizona is unlikely to succeed because the payments it made to its residents are includable in income and do not qualify for any special exclusion from income.

Arizona has alleged that it was irreparably harmed because it had to make available Forms 1099 to the recipients of its payments, it lost state tax revenues, and its state sovereignty has been harmed. None of these are irreparable under the law. Finally,

the equities favor the federal government, and the public interest is best served by the maintenance of the status quo. Arizona's motion should be denied.

## II.    BACKGROUND

On March 13, 2020, the President declared that the novel COVID-19 outbreak in the United States constituted a national emergency under the National Emergencies Act. ECF No. 18-1, Ex. 11. On that same day, the President determined that the COVID-19 pandemic was of sufficient severity and magnitude to warrant an emergency declaration. *Id.* Because the President determined that the COVID-19 pandemic warranted assistance by the federal government, on March 13, 2020, the COVID-19 pandemic was also a "federally declared disaster." *Id.* On February 24, 2021, the President continued the national emergency concerning the COVID-19 pandemic beyond March 1, 2021. *Id.*

On February 10, 2023, the President announced that he anticipated terminating the national emergency concerning the COVID-19 pandemic on May 11, 2023. Against this backdrop and on that same day, February 10, 2023, the IRS announced that it was:

> [A]ware of questions involving special tax refunds or payments made by certain states related to the pandemic and its associated consequences in 2022. A variety of state programs distributed these payments in 2022 and the rules surrounding their treatment for federal income tax purposes are complex. While in general payments made by states are includable in income for federal tax purposes, there are exceptions that would apply to many of the payments made by states in 2022.

ECF No. 18-1, Ex. 1. Regarding the special payments that were made by 21 states in 2022, the IRS explained that due to their "fact-specific nature" and to "provide certainty and clarity," it determined that taxpayers in those states didn't need to report the payments in "the interest of sound tax administration and other factors." *Id.* The IRS "[would] not challenge" the taxability of payments that were made by 17 states related to general welfare or disaster relief. *Id.* Payments made in four additional states would not be includable in income for federal tax purposes if certain requirements were met. *Id.* The announcement clarified that its guidance only applied to 2022 payments. *Id.*

The COVID-19 pandemic and the related "federally declared disaster" terminated on May 11, 2023. *Id.*, Ex. 9. On that same day, Arizona enacted into law the Arizona Families Tax Rebate, which was to provide a one-time payment to Arizona residents who claimed a dependent care tax credit in 2021 and had a state tax liability of at least $1 in 2019, 2020, or 2021. The law reflected the Arizona Legislature's finding that "[i]nflation is at a forty-year high, putting gas, groceries and other necessities out of reach for many Arizonans." *Id.*, Ex. 8, § 3(L)(1). Because of "[r]esponsible budgeting," the state was able "to take action to mitigate the harmful impacts of inflation by returning a portion of the surplus to this state's taxpayers with dependents." *Id.* § 3(L)(2). Nothing in the text of the law refers to the COVID-19 pandemic or a federally declared disaster, and the earliest payments could not be made until months later, in October 2023. The law also provides that "any rebate received by a taxpayer pursuant to this section and required to be included in Arizona gross income under the internal revenue code shall be subtracted from the taxpayer's Arizona gross income." *Id.* § 3(I).

On August 30, 2023, the IRS issued Notice 2023-56 in which it explained how it evaluates state payments and their refund status, the general welfare, and disaster relief exclusions, and their inclusion in taxable income. *Id.*, Ex. 11. That same day the IRS hosted a call with state departments of revenue to share and discuss the substance of Notice 2023-56. Declaration of Courtney Kay-Decker, ¶ 4. A representative from the Arizona Department of Revenue ("ADOR") was on that call. *Id.*

On October 3, 2023, ADOR contacted the IRS's Taxpayer Experience Office requesting guidance on the federal tax consequences of the Arizona payments. *Id.* ¶ 5. After some back and forth between ADOR and the IRS, representatives from Arizona met with IRS personnel on December 7, 2023. Declaration of Angella Warren, ¶ 6. During that meeting, the IRS explained the refund status of the payments, that neither the general welfare nor disaster relief exclusion applied, and that the payments would be considered income to the recipients for federal income tax reporting purposes and would need to be reported by Arizona on a Form 1099-MISC. *Id.*

Soon after, ADOR hosted on its webpage a section dedicated to the Arizona Families Tax Rebate. ECF No 18-1, Ex. 13. On this page and by January 31, 2024, the ADOR made available to payment recipients Forms 1099-MISC. *Id.* ADOR also advised payment recipients that the IRS "has determined that the rebate **is** subject to **federal** income tax and, thus, requires it to be reported as part of the federal adjusted gross income on the 2023 federal income tax return." *Id.* (emphasis in original).

On February 15, 2024, in response to a letter from Attorney General Kris Mayes dated January 25, 2024, IRS Commissioner Daniel Werfel reiterated the IRS's position that the state payments would be taxable to recipients for federal income tax purposes. *Id.*, Ex. 12. Commissioner Werfel advised that, consistent with the guidance expressed in Notice 2023-56, any label given to a payment made under state law is not controlling for federal tax purposes. *Id.*

The letter explained that under 26 U.S.C. § 61, gross income includes all income from whatever source derived unless an exception applies. Arizona sought to have its payments excluded under the general welfare exclusion or to be considered refunds of state income tax. As to the former, Commissioner Werfel explained that payments qualifying for the general welfare exclusion are "generally limited to payments made pursuant to a program limited to low-income recipients." *Id.* While acknowledging that the 2023 Arizona payments were income limited, he stated that "[e]ligibility for the payments begins to phase out at $400,000 for married taxpayers filing jointly and $200,000 for all other filers." *Id.* Those amounts far exceed the "median adjusted gross income ("AGI") for Arizona filers ($30,000 single, $94,000 married filing jointly for 2021) … [and] 98% of Arizona single filers had AGI below $200,000 and 95% of married joint filers had AGI below $400,000 in 2021." *Id.* He also pointed out that "Arizona residents that had no tax liability in 2019-2021 were not eligible to receive a payment." "Thus, rather than targeting relief to low-income residents with dependents, the legislation expressly excludes such low-income residents from receiving the payments while including almost all similarly situated Arizonans with higher incomes."

*Id.* He also explained that the payments could not properly be considered state tax refunds "because the amount paid to taxpayers is not capped at the amount of tax previously paid." *Id.*

On February 21, 2024, Arizona initiated the instant action and this motion followed on February 28, 2024. ECF Nos. 1 and 18.

### III.   ARGUMENT

Arizona seeks a preliminary injunction which is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). Arizona must establish that: (1) it is "likely to succeed on the merits" of its complaint; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) the preliminary injunction "is in the public interest." *Winter*, 555 U.S. at 20. The last two "factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). If a plaintiff raises "serious questions going to the merits," a court may grant interim relief if the balance of hardships "tips sharply towards the plaintiff," the plaintiff is likely to suffer irreparable harm, and the interim relief is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

### A.   Arizona is not likely to succeed on the merits.

Arizona is not likely to succeed on the merits because it lacks standing, cannot identify a waiver of the United States' sovereign immunity, the AIA, and DJA bar its complaint, and the payments are properly includable in income.

#### 1.   Arizona lacks standing.

A plaintiff must have "a personal stake in the outcome of the controversy' [so] as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). At its "irreducible constitutional minimum," Article III standing requires a plaintiff, as the party invoking the Court's jurisdiction, to establish: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between

the injury and defendant's challenged conduct, such that the injury is "fairly traceable to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," *Lujan*, 504 U.S. at 561, but "a plaintiff cannot rely solely on conclusory allegations of injury." *Baur v. Veneman*, 352 F.3d 625, 637 (2d Cir. 2003); *see Schmier v. United States*, 279 F.3d 817, 826 (9th Cir. 2002) (rejecting conclusory allegations).

Arizona has not met its burden. It challenges the IRS's administrative position that the 2023 payments Arizona made are includable in the recipients' income and thus may result in federal income tax liability. But recognizing that it cannot mount that challenge directly, it claims injury by the IRS because it *may* have lost $480,000 in sales tax revenue and it made available Forms 1099-MISC to affected taxpayers. Complaint ¶¶ 77, 79. Neither of these harms is concrete, particularized, actual or imminent enough to confer standing.

To begin, states may sue the federal government only to vindicate their sovereign or quasi-sovereign interests, not to litigate the personal claims of their taxpayers. *See, e.g.*, *Maryland v. Louisiana*, 451 U.S. 725, 737 (1981) (a state cannot interject itself into a controversy "as a nominal party in order to forward the claims of individual citizens"); *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976) (it has "become settled doctrine that a State has standing to sue only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer [for] the personal claims of its citizens"). Therefore, Arizona may not predicate standing on its residents' alleged increased federal tax liability.

The complaint does not sufficiently allege that the IRS's suggested tax treatment will cause Arizona to suffer "a direct injury in the form of a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (considering the alleged loss of severance tax revenues linked to coal extraction and sale). A speculative decline in

general tax revenues is not an adequate injury-in-fact. *See Florida v. Mellon*, 273 U.S. 12, 17-18 (1927) (rejecting Florida's claim of direct injury predicated on anticipated loss of tax revenue attributable to residents leaving the state because of the new federal inheritance tax). Even if Arizona could show a decline in revenue, it was self-inflicted because Arizona's legislature chose a form of payment that didn't satisfy longstanding principles for exclusion from income. Self-inflicted harms to the state fisc cannot confer standing. *Pennsylvania*, 426 U.S. at 664. Plaintiffs rely exclusively on *New York, et al., v. Yellen*, 15 F.4th 569, 576-77 (2d Cir. 2021). But there the plaintiff states alleged a *direct* injury to their taxing authority separate from the higher taxes their residents would pay because *Congress* decreased the deduction for state and local taxes. Arizona has only alleged an injury derivative of its residents paying higher taxes because of Arizona's choices about how to design its "rebate" program. But if this is a sufficient injury for a state to allege for standing purposes, then each year any state could manufacture standing to challenge any IRS position that resulted in its residents paying higher taxes. This result would upend tax procedure and render Article III's injury requirement meaningless.

Moreover, Arizona has offered the Court only a bare and speculative estimate of $480,000 in lost sales tax revenue. Complaint ¶ 77; ECF No. 18-2, ¶ 6. But such injury is purely conjectural and hypothetical, unlike in *New York* where the plaintiff states provided robust expert declarations with detailed analysis (*see* Section B, *infra*). Many factors affect whether Arizona taxpayers would pay federal income tax on the payments received. Those include, for example, whether: (1) they had sufficient income in 2023 to be subject to federal income tax, (2) they report the payments as income, (3) they have losses or credits that would offset any additional tax attributable to treatment of the payments as income, and (4) the IRS pursues any adjustments if they do not report the payments as income. It is pure speculation to suggest any federal tax treatment would cause the payment recipients to spend less on purchases that are subject to Arizona sales taxes.

Arizona's alleged loss of sales tax revenue cannot be causally connected to the IRS's advice. To satisfy the causality element for Article III standing, Arizona must show that its injury is causally linked or "fairly traceable" to the IRS's administrative position. *Washington Env't. Council v. Bellon*, 732 F.3d 1131, 1141-42 (9th Cir. 2013). Here, it is hard to see how the IRS advice could have had any influence on spending decisions for cash Arizonans received before the advice was even given.

Arizona not only cannot establish a loss of sales tax revenue traceable to the IRS's conduct, but it also cannot establish any injury that is redressable by the Court. "Redressability asks whether the district court had the power to prevent the injury at the time the complaint was filed." *Tucson v. City of Seattle*, 91 F.4th 1318, 1325 (9th Cir. 2024). Even if the IRS were to change its position and declare the payment excludable from income, that won't make the payment recipients spend more money in Arizona on items or services subject to sales tax in 2023. So too Arizona's complaints about issuing Forms 1099—that has already happened, and there is no undoing it.

Moreover, the obligation to make available Forms 1099-MISC to the recipients of payments of $600 or more followed from the application of 26 U.S.C.§ 6041(a) and Treas. Reg. § 1.6041-1(b)(1) and (i) (*see infra* p. 18) and did not result solely from the IRS's administrative position. And, as explained below, Arizona would have had to issue Forms 1099 if it were to prevail on its theory that the payments were state tax refunds. Arizona's allegations thus rely on an impermissible "highly attenuated chain of possibilities" and fail to satisfy the Article III requirement of an injury to support standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

2.     *Arizona has failed to establish a waiver of sovereign immunity.*

The United States can be sued only if it waives its sovereign immunity. The doctrine of sovereign immunity precludes suit against both federal agencies and their employees, if acting in their official capacities. *Hodge v. Dalton*, 107 F.3d 705, 707 (9th Cir. 1997). Arizona alleges jurisdiction under 28 U.S.C.§§ 1331 and 1340. Complaint ¶ 9. Although 28 U.S.C. § 1331 provides that "[t]he district courts shall have original

jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," and 28 U.S.C. § 1340 generally confers jurisdiction for matters arising under the internal revenue laws, the United States has not waived its sovereign immunity to suit based on general jurisdictional statutes. *See Hughes v. United States*, 953 F.2d 531, 539 n.5 (9th Cir. 1992) (neither 28 U.S.C. §§ 1331 nor 1340 nor 1343 waives sovereign immunity); *see also Dunn & Black, P.S. v. United States*, 492 F.3d 1084, 1088 n.3 (9th Cir. 2007); *Arford v. United States*, 934 F.2d 229, 231 (9th Cir. 1991); *De Masters v. Arend*, 313 F.2d 79, 84 (9th Cir. 1963). Finally, although 5 U.S.C. § 702 can serve generally as a waiver for Administrative Procedure Act ("APA") claims in some cases, it does not in this case, for the reasons discussed below.

### 3. There is no waiver of sovereign immunity under the APA.

Arizona seeks injunctive and declaratory relief under the APA, but the APA does not apply, and sovereign immunity is not waived, where: (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law. 5 U.S.C. § 701(a). In addition, the APA does not apply if the decision under review is not a "final agency action for which there is no other adequate remedy in a court...." 5 U.S.C. § 704; *Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998). Two conditions must be satisfied for an agency action to be final. The action must mark the consummation of the agency's decision-making process. The action must be one by which rights or obligations have been determined, or from which legal consequences will flow. *See Gallo*, 159 F.3d at 1198–99; *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (overruled on other grounds). Thus, even an "ultimate administrative position" is not final for purposes of the APA unless it is one "by which 'rights or obligations have been determined.'" *Fairbanks N. Star Borough v. United States Army Corps of Engineers*, 543 F.3d 586, 591, 593 (9th Cir. 2008) (quoting *Bennett*, 520 U.S. at 178) (dismissing a claim challenging agency action because it was not "final" on that standard). The February 15, 2024 letter Arizona received from the IRS was not a final agency action.[1] The letter

---

[1] The IRS issues copious informal guidance that lacks binding legal effect, including (1) informal letters to states, taxpayers, and other constituents; (2) informational notices

expressed the IRS's administrative position about the tax treatment of the payments

Arizona made. It did not determine any of Arizona's rights or obligations. It also has no

legal consequence for the recipients of payments who are free to seek a determination

through the IRS examination process, and ultimately from a court. Accordingly, the

IRS's administrative position is not final agency action.

"Even if final, agency action is reviewable under the APA only if there are no

adequate alternatives to APA review in court." *U.S. Army Corps of Engineers v. Hawkes

Co.*, 578 U.S. 590, 600 (2016); 5 U.S.C. § 704. Here, the tax consequence of a taxpayer

including (or not including) the amount of the payment received in income will be

determined via their 2023 tax return. Taxpayers may omit the payment and defend the

omission in the Tax Court or report the payment and "bring an action against the

Government either in United States district court or in the United States Court of Federal

Claims," provided they "comply with the tax refund scheme established in the Code."

*Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 4-5 (2008) (referencing 28 U.S.C.

§ 1346(a)(1), 26 U.S.C. § 7422, and the jurisdictional prerequisite for such a suit.). The

IRS's administrative position is not a final agency action for which there is no adequate

remedy because Arizona taxpayers can sue to challenge the IRS's position.

### 4. The AIA and DJA bar Arizona's complaint.

Even if Arizona has standing to sue and the APA provided an avenue for review,

the Court still lacks jurisdiction because the complaint is barred by the AIA and the DJA.

The AIA provides that "no suit for the purpose of restraining the assessment or collection

of any tax shall be maintained in any court by any person, whether or not such person is

the person against whom such tax was assessed." 26 U.S.C. § 7421(a). "The manifest

purpose of [the AIA] is to permit the United States to assess and collect taxes alleged to

be due without judicial intervention, and to require that the legal right to the disputed

to taxpayers; (3) publications to educate tax practitioners and the public; and (4) FAQs, press releases, and other informal advice on the IRS website. *See Caterpillar Tractor Co. v. United States*, 589 F.2d 1040, 1043 (C. Cl. 1978) ("It is hornbook law that informal publications all the way up to revenue rulings are simply guides to taxpayers, and a taxpayer relies on them at his peril.").

sums be determined in a suit for refund." *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7 (1962). If the AIA applies, federal courts lack jurisdiction. *See id.* at 5.

The DJA, 28 U.S.C. § 2201(a), bars declaratory relief related to federal taxes. As the Supreme Court noted in *Bob Jones Univ. v. Simon*, 416 U.S. 725, 732 n.7 (1974), the tax exception to the DJA demonstrates the "congressional antipathy for premature interference with the assessment or collection of any federal tax." The scope of the DJA is at least as broad as that of the AIA. *Id.* The Supreme Court has interpreted the AIA and DJA broadly, to protect the Treasury from suits seeking to interject the courts prematurely into federal tax disputes. In doing so, the Court has confined tax litigation to the precise channels prescribed by Congress, such as suits for refund, *Bob Jones Univ.*, 416 U.S. at 746, pre-assessment summons enforcement suits in federal district court, 26 U.S.C. § 7604, and pre-assessment Tax Court deficiency proceedings, 26 U.S.C. § 6213(a).

Arizona seeks to restrain "the assessment or collection of [a] tax." *See, e.g.*, Complaint, Prayer for Relief at b. (seeking to "[e]njoin the IRS from enforcing its unlawful determination and to refund amounts that have been unlawfully collected"). And states are among the "persons" to which the AIA applies. *See South Carolina v. Regan*, 465 U.S. 367, 373-81 (1984). Because Arizona's complaint falls squarely within the AIA and DJA's prohibitions, it is unlikely to succeed on the merits. *See Bob Jones Univ.*, 416 U.S. at 738-39, 749.

Arizona may attempt to invoke a judicially created exception to the AIA. In *South Carolina v. Regan*, the Supreme Court considered a constitutional challenge to a statute that eliminated a federal tax exemption for interest on unregistered "bearer" bonds, restricting the exemption to bonds whose ownership was registered. 465 U.S. at 371. South Carolina asserted a sovereign interest in issuing bonds in the form of its choice. *Id.* at 371-72. The Court held that the AIA did not bar South Carolina's suit (though it ultimately rejected the state's claim on the merits) because applying the AIA would have risked precluding all judicial review of the statute. *See id.* at 373.

11

We do not even reach the *Regan* exception here. Given Arizona's lack of independent standing, its claims necessarily fall outside *Regan*. *See Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1436 (D.C. Cir. 1987). Moreover, Arizona's derivative and speculative injuries are not an "irreparable injury" sufficient to justify injunctive relief. *See Williams Packing*, 370 U.S. at 6. Absent those showings, the Court need not consider whether Arizona's claims fall within the *Regan* doctrine. In any event, the *Regan* exception is narrow. *See Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax & Trade Bureau*, 843 F.3d 810, 815 (9th Cir. 2016). The AIA's plain language and legislative purpose require strict construction of any judicially created exceptions. *See Am. Bicycle Ass'n v. United States* (*In re Am. Bicycle Ass'n*), 895 F.2d 1277, 1281 (9th Cir. 1990).

This case is also different from *Regan* because the violation of a supposedly sovereign interest asserted by Arizona (speculative loss of sales tax revenue) is an alleged secondary consequence of the possible increase in some of its *residents'* federal taxes. In contrast, the sovereign interest in *Regan* went to the *state's* issuance of bonds in a form that would require the *state* to pay more. Simply put, *Regan* does not stand for the principle that a state can sue anytime its residents' federal taxes increase. Sanctioning an AIA workaround in these circumstances would be anything but narrow and open the floodgates to state-sponsored tax suits on their residents' behalf.

On the other side of the coin, any Arizona taxpayers who include the payment in income and pay more federal tax—unlike Arizona itself—have a direct economic interest in challenging the IRS's tax treatment. Unlike in *Regan*, Arizona need not struggle to "convince a taxpayer to raise [their] claims," nor can Arizona show such a challenge is a possibility so remote that the tax treatment would remain unreviewed. *Cf. Regan*, 465 U.S. at 380-81. As the Ninth Circuit ruled in similar circumstances:

> [*Regan's*] narrow exception is inapplicable here. Most critically, in *Regan*, the state's interest in issuing bonds in the form it chose existed separately from the bondholders' interest in avoiding taxation. A bondholder could avoid taxation simply by purchasing registered bonds, and thus would have little incentive to pay the tax, file a refund suit,

> and raise the state's constitutional claims. Therefore, the state would be required to depend on the mere *possibility* of persuading a third party bondholder to assert its claims. Here, in contrast, the Yakama Nation's asserted injury flows from the taxation of its members, and thus is wholly derivative of any injury suffered by [the members].

*Yakama*, 843 F.3d at 815 (emphasis in original).

Here, as in *Yakama*, the places of the state and the individual taxpayers are reversed compared to *Regan*: the individual taxpayers are directly affected by a possible tax treatment, while Arizona's asserted sovereign interests are at best secondary or derivative. Similarly, Arizona's desire for its residents to not pay federal income tax on its payments is duplicative of those residents' own interests in minimizing their taxes through Congressionally-approved channels. The AIA and DJA therefore bar this suit.

5.      *The IRS's administrative position is not arbitrary and capricious.*

Even if the IRS's administrative position were reviewable under the APA, relief would not be warranted because it is not arbitrary and capricious. Under the "arbitrary and capricious" standard, a court may not set aside an agency decision that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 42 (1983). Although the court's inquiry is thorough, this "standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity and we may not substitute our judgment for that of the agency." *San Luis & Delta-Mendota Water Auth. V. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). "Where the agency's line-drawing does not appear irrational and the [party challenging the agency action] has not shown that the consequences of the line-drawing are in any respect dire … [courts] will leave that line-drawing to the agency's discretion." *J&G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1052 (9th Cir. 2007) (citation omitted). As discussed further below, the IRS's administrative position, that the Arizona payments do not qualify as refunds or for the general welfare or disaster relief exclusions, is based on the IRS's rational and reasoned analysis and is not arbitrary or capricious.

6. *The payments Arizona made in 2023 are includable in income.*

Even assuming jurisdiction, Arizona is still unlikely to succeed on the merits of its complaint. The term "income" "sweeps broadly" and encompasses "any accession to wealth." *United States v. Burke*, 504 U.S. 229, 233 (1992). Under 26 U.S.C. § 61(a) gross income means all income from whatever source derived, unless excluded by law. Arizona's payments fall outside any exclusion.

a) Arizona's payments are not refunds of state taxes paid.

Generally, state tax refunds are not includable in a taxpayer's income because, as the return of an overpayment of the taxpayer's state tax liability, a refund is not an accession to wealth. *See* Notice 2023-56, 2023-38 I.R.B 824.; Rev. Rul. 70-86, 1970-1 C.B. 23. Yet a state's characterization of a payment (*e.g.*, refunds, overpayments, or rebates) is not determinative for federal income tax purposes. *Maines v. Comm'r*, 144 T.C. 123, 132 No. 8 (2015). Rather, federal tax law looks to the substance of the payments to determine the legal interests and relationships established under the state law. *Id.* And when a state law authorizes payments that are limited to individuals' state tax liabilities, the amounts paid are treated as state tax refunds for federal income tax purposes because the purpose of the payment is to refund amounts previously paid. *See* Notice 2023-56, 2023-38 I.R.B 824. That is not the case here. Arizona's law allows residents who claimed the dependent tax credit in 2021 to receive a payment of up to $750 if they had a tax liability of at least $1 in 2019, 2020, or 2021. Had Arizona capped the amount of its payment at state taxes paid in 2019-2021, then the tax treatment may have differed. But it didn't. Accordingly, the payments cannot be considered refunds (or rebates) and must be included in income for federal income tax purposes.[2]

---

[2] This outcome is consistent with what the Arizona Legislature understood when it passed the Arizona Families Tax Rebate—that recipients of the payments might include the payment for federal tax purposes in income. *See*, Section II, *infra*. The legislature thus contemplated the status quo (taxability of the rebate) before enactment.

b)  Arizona's payments do not qualify for the general welfare exclusion.

Although § 61 provides for broad includability in gross income (as Arizona acknowledges), for nearly 100 years the IRS has allowed certain payments to individuals or families by governmental units under legislatively provided social benefit programs to be excluded from the recipient's gross income under what it calls the "general welfare exclusion." Motion at 11. In determining whether the general welfare exclusion applies to payments, the IRS generally requires that the payments be: (1) made from a governmental fund; (2) for the promotion of the general welfare (i.e., based on individual or family need rather than to all residents regardless of financial status, health, educational background, or employment status); and (3) not for services that the recipient provides. *See* Rev. Rul. 2005-46, 2005-2 C.B 120.

Payments that are based on some criteria other than individual or family need rarely qualify for the general welfare exclusion. In addition, the exclusion has generally applied to payments for a specific welfare-oriented purpose such as food, medical care, housing, personal property, transportation, funeral expenses, and disaster relief. The IRS has further limited the general welfare exclusion to government programs that make payments to low-income individuals or families.[3]

The 2023 Arizona payments do not qualify for the general welfare exclusion for two reasons. First, the income limitations for the payments are above the limit of what is generally considered to be covered by the general welfare exclusion. Eligibility for the payments begins to phase out at $400,000 for married taxpayers filing jointly and $200,000 for all other filers. Those amounts represent multiples of the median adjusted gross income for Arizona filers and encompass most Arizonans.

Second, Arizona residents that had no tax liability in 2019-2021 were not eligible to receive a payment. As a result, residents with income below the Arizona standard

---

[3] *See, e.g.*, Rev. Rul. 78-170, 1978-1 C.B. 24 (payments made by the State of Ohio to lower-income, elderly individuals to reduce their cost of winter energy consumption); Rev. Rul. 76-395, 1976-2 C.B. 16 (home rehabilitation grants to low-income families to correct substandard conditions); CCA 200908025 (payments to low-income households for the purchase and installation of energy efficient furnaces and boilers).

deduction did not receive a payment. This group includes single residents with income below $12,550 and married couples with income below $25,000. Thus, rather than targeting relief to low-income residents with dependents, the legislation expressly excludes such low-income residents from receiving the payments, while including almost all similarly situated Arizonans with higher incomes. Because the payments are not based on need, they cannot qualify for the general welfare exclusion.

Arizona makes much of its "reliance" on the IRS's tax treatment for the 21 states that issued payments in 2022, during the COVID-19 pandemic and federally declared disaster. But evidence of this "reliance" is missing from the record. There is not one reference in the text of the law authorizing the payments to the IRS's statement on the 2022 payments, to the COVID-19 pandemic, or to the federally declared disaster. There is no discussion about whether Arizona modeled its program after any of the 21 states that received its desired tax treatment in 2022. There is no mention that Arizona expects these amounts to be excluded from federal income tax based on the general welfare or disaster relief exclusions, and there is no statement that the purpose of these rebates was to be refunds of taxes paid. Instead, the text refers generally to inflation, a budget surplus, and the possibility that the payments will be included in income for federal tax purposes. And it only requires a single dollar of tax liability. The facts do not support Arizona's narrative.

Even if Arizona could claim reliance, it would have been misplaced based on the IRS's explanation that its decision not to challenge various state programs in 2022 was made in "the best interest of sound tax administration and given the fact that the pandemic emergency declaration is ending in May, 2023 making this an issue only for the 2022 tax year." ECF 18-1 at 7. Arizona cannot claim both reliance on the guidance and ignorance that the circumstances animating it would not hold for 2023. Arizona does not deny knowing the relevant criteria for evaluating whether its payments could properly be excluded from income (Motion at 11-12); it just argues those criteria should not apply. No matter what the IRS determined for the 21 states in 2022, longstanding tax principles

require that the payments Arizona made in 2023 be evaluated on their own. And because those payments were not based on the financial need of the individual or family receiving them, they cannot qualify for the general welfare exclusion.

c)  Arizona's payments do not qualify as disaster relief.

Section 139(a) provides that gross income does not include any amount received by an individual as a qualified disaster relief payment. 26 U.S.C. § 139(a). Section 139(b)(4) defines a qualified disaster relief payment to include, among other things, any amount paid to or for the benefit of an individual if such amount is paid by a federal, state, or local government, or agency or instrumentality, in connection with a qualified disaster to promote the general welfare. 26 U.S.C. § 139(b)(4). Under § 139(c)(2), a qualified disaster includes a federally declared disaster as "defined by section 165(i)(5)(A)" of the Code. 26 U.S.C. § 139(c)(2). Section 165(i)(5)(A) defines a federally declared disaster as "any disaster subsequently determined by the President of the United States to warrant assistance by the Federal Government under the Robert T. Stafford Disaster Relief and Emergency Assistance Act." 26 U.S.C. § 165(i)(5)(A).

The remaining criteria for disaster relief payments under § 139(b)(4) are that the payments be made "in connection with" the disaster and that they are made to "promote the general welfare." 26 U.S.C. § 139(b)(4). In the context of a qualified disaster, such as the COVID-19 pandemic, the financial need prong of the general welfare requirement is presumed for all individuals affected by the disaster, and general welfare assistance is allowed for all such individuals. *See* Notice 2002-76, 2002-2 C.B. 917.

The state legislature approved the 2023 Arizona payments the same day the COVID-19 pandemic, a "federally declared disaster" as defined by § 139(c)(2), terminated, and payments were not made until many months later. Moreover, the expressed purpose of the payments was to "mitigate the harmful impacts of inflation." ECF No. 18-1, Ex. 8 § 3(L)(2). The law makes no mention of the federally declared disaster related to the COVID-19 pandemic or any other potentially qualifying event. Because the payments were not made in connection with a federally declared disaster

17

when the payments were made, they cannot qualify for the disaster relief exclusion. And as with the general welfare exclusion, Arizona's reliance claim lacks merit.

### B.   Arizona will not suffer irreparable harm.

Arizona has identified three harms it argues are irreparable—none are. First, Arizona argues it was irreparably harmed because it made Forms 1099 available to its residents that received a payment. Motion at 18. But in the preliminary injunction context a past harm cannot justify an injunction. The purpose of a preliminary injunction is not to remedy past harm but to protect from irreparable injury that would otherwise result. *BakeMark USA LLC v. Pastis*, No. CV-23-02674-PHX-SMB, 2024 WL 810635, at *4 (D. Ariz. Feb. 27, 2024) (citations omitted). For an injunction to issue, Arizona must show that there is a real and immediate threat that it will be wronged again. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). This it cannot do. The "onetime" payments Arizona made to its residents and the corresponding Forms 1099 it issued will not recur. Arizona is not under threat that it will be "wronged" again and this "harm" thus does not support issuing an injunction. Issuance of an injunction now based on this past event would be punitive.

Arizona also fails to mention that if the payments it made were, as it contends, refunds of state taxes paid and were $10 or more, then it still would have had to report those payments to the IRS and make Forms 1099 available to those recipients. 26 U.S.C. § 6050E. Those forms would have just been Forms 1099-G instead of Forms 1099-MISC. Each year Arizona must file with the IRS and make available to its residents who receive refunds or other state payments Forms 1099-G if they received $10 or more. 26 U.S.C. § 6050E. Instead, based on the IRS advice to Arizona that its payments were not properly considered refunds of taxes paid, it needed to file and make available Forms 1099-MISC only for taxpayers who received $600 or more. 26 U.S.C. § 6041(a).[4] Arizona had to

---

[4] Arizona contends that 75% of the payment recipients claimed an average payment of $370. ECF No. 18-2, ¶ 4. Assuming this is true, Arizona was not required to file or make available Forms 1099-MISC to most of the payment recipients. To the extent that Arizona claims it was burdened by the statutory reporting requirement, that is a burden that was largely self-imposed.

issue Forms 1099 to its residents regardless of the IRS's suggested tax treatment. And it had to issue these forms because of a statutory reporting requirement, not because of the advice it received.

Second, Arizona argues that it lost an estimated $480,000 in sales tax revenue. Motion at 19. At the very least, Arizona's estimated loss is speculative.[5] The 2023 Arizona one-time payments had to be issued to qualified recipients between October 15, 2023, and November 15, 2023. ECF No. 18-1, Ex. 8, § 3(G). It is likely that most recipients spent the payments soon thereafter and generated sales tax revenue.[6] Arizona doesn't explain how it determined they did not. Accordingly, Arizona may not have been deprived of any sales tax revenue. Even if Arizona could prove some loss, it would not justify an injunction. Monetary harm does not equate to irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." "Mere injuries, however substantial, in terms of money, time and energy necessarily expended [] are not enough."); *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 851 (9th Cir. 1985) ("economic injury alone is not considered irreparable"); *Hughes v. United States*, 953 F.2d 531, 536 (9th Cir. 1992).

Finally, Arizona argues that its "equal sovereignty" has been harmed because of the IRS's disparate treatment of it without a reasoned basis.[7] Motion at 19. But if Arizona's "harmed equal sovereignty" results from the IRS distinguishing Arizona's 2023 payments from those made in 2022 during the COVID-19 pandemic and federally

---

[5] The Declaration of Karen Jacobs provides this estimate in conclusory fashion. Because the declarant has failed to explain how she arrived at this estimate, it is impossible to evaluate its merit.

[6] Arizona may counter that it will lose sales tax revenue because of the extra amount recipients might pay in federal income tax in 2024 because of including the payment in 2023 income. This is even more speculative and attenuated, and that argument could be made about all payments of federal income tax every year.

[7] Arizona's citation to *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 544 (2013) is not compelling. That case is about the application of the Voting Rights Acts to nine states that were required to seek preclearance from federal authorities before any changes could be made to state election laws. *Id.* Here, there is no restraint on Arizona's ability to issue payments to its residents and any resulting federal tax treatment, based on longstanding tax principles, does not offend any "tradition of equal sovereignty." *Id.*

declared disaster, it's not convincing. It is hard to imagine a more reasoned basis than that the pandemic circumstances that existed in 2022 had abated by 2023. Further, the IRS's advice concerning the application of longstanding *federal* tax principles to payments that Arizona freely made to its residents is not an infringement on state sovereignty and certainly doesn't constitute irreparable harm that would justify an injunction. *See, e.g.*, *South Carolina v. Baker*, 485 U.S. 505, 513-514 (1988) (state sovereignty does not shield states from federal tax policies regulating state activities).

### C.   The balance of equities and public interest do not support a preliminary injunction.

Arizona argues that the remaining two requirements for a preliminary injunction, the balance of the equities and the public interest, support a preliminary injunction. Arizona is wrong. The IRS is not discriminating against Arizona and is not subjecting its residents to discriminatory taxation.[8] Arizona would like the Court to believe that the IRS only started applying the general welfare and disaster relief exclusions in 2023 in connection with the payments issued by 21 states in 2022 and that going forward all state payment programs should receive the same treatment. As explained (*supra* pp. 15-16), the IRS has been making these decisions for almost a century. And rather than being the rule, the determinations made for the 2022 payments were the exception because when those payments were made, the United States was in the novel COVID-19 pandemic—a federally declared disaster nationwide. Arizona's dislike of the IRS's application of longstanding principles does not make them inequitable.

Finally, if the Court were to enjoin "the IRS from taxing the Rebate" (Motion at 20:9), the harm to tax administration would be significant. First, if the IRS prevails on the merits of this case, the requested injunction would impose a tremendous burden on the IRS to attempt to collect tax on the payments in the future. Second, the requested injunction is unworkable. It would be extraordinarily difficult for the IRS to identify all

---

[8] The State of Minnesota made similar payments to its residents in 2023. The IRS has taken the same administrative position as it relates to those payments—they do not qualify for the general welfare or disaster relief exclusions and should be included in income. commissioner-werfel-letter-to-stauber.pdf (house.gov)

the individuals that have filed their 2023 returns and reported the Arizona payments in income because of the nature of the federal tax forms and the different ways taxpayers can report income. Declaration of Douglas O'Donnell, ¶¶ 6-8. In addition, an injunction would force the IRS to divert resources from other core functions affecting all taxpayers nationwide with little time left before the filing deadline. *Id.* ¶ 10. This is why the public interest is best served by preserving the status quo. Because at the highest level, "the protection of the public fisc is a matter that is of interest to every citizen." *Brock v. Pierce Cty.*, 476 U.S. 253, 262, 265 (1986). And the "general public [has an] interest in the efficient allocation of the government's fiscal resources." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017). Making the IRS change course at this point in the tax season for a select group of Arizona taxpayers is not in the national public interest.

The better way to provide relief to any affected Arizona taxpayers is to let this litigation proceed in the normal course. At its conclusion, if the government has prevailed on the merits, which is likely, then no action will be necessary. In the unlikely event Arizona succeeds on the merits, all affected taxpayers could seek relief by filing amended returns and receiving federal tax refunds. O'Donnell Decl., ¶¶ 11, 18. This return of taxes collected to the affected taxpayers would also presumably make Arizona whole in the form of the resulting spending and sales tax revenues.

## IV.   CONCLUSION

For the above reasons, the State of Arizona's motion for a preliminary injunction should be denied. It has not carried its burden of persuasion with the clear showing that would entitle it to the drastic and extraordinary remedy sought. The government should be allowed the time to respond more fully to the complaint by filing a response within the time allowed by the Federal Rules of Civil Procedure.

DATED this 15th of March, 2024

DAVID A. HUBBERT
Deputy Assistant Attorney General

*/s/ Amy Matchison*
AMY MATCHISON
Trial Attorney, Tax Division
U.S. Department of Justice