DAVID A. HUBBERT
Deputy Assistant Attorney General

AMY MATCHISON
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 683
Washington, D.C. 20044
Telephone:    (202) 307-6422
Fax:              (202) 307-0054
Email:    Amy.T.Matchison@usdoj.gov
              Western.Taxcivil@usdoj.gov

*Attorneys for United States of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona,<br><br>            Plaintiff,<br><br>      v.<br><br>United States Internal Revenue Service; Daniel I. Werfel, in his official capacity as Commissioner of the United States Internal Revenue Service; the United States Department of Treasury; Janet L. Yellen, in her official capacity as Secretary of the United States Department of Treasury; and the United States of America,<br><br>            Defendants. | Case No. 2:24-cv-00355-PHX-GMS<br><br>**UNITED STATES' MOTION TO DISMISS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |

i

# TABLE OF CONTENTS

**I.   INTRODUCTION** ............................................................................................... 1

**II.  STATEMENT OF FACTS** ................................................................................. 1

**III. ARGUMENT** ...................................................................................................... 3

   A.   THIS ACTION SHOULD BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(B)(1)
BECAUSE ARIZONA HAS FAILED TO ESTABLISH SUBJECT-MATTER JURISDICTION. ........... 3

     *1.   Arizona lacks standing.* ............................................................................ 4

     *2.   Arizona has failed to establish a waiver of sovereign immunity.* ........................ 7

     *3.   There is no waiver of sovereign immunity under the APA.* ............................... 8

     *4.   The AIA and DJA bar Arizona's complaint.* ....................................................... 10

     *5.   No judicial exception to the AIA authorizes this suit.* .......................................... 11

       a)   The *Williams Packing* exception does not apply. ........................................... 11

       b)   The *Regan* exception does not apply. ............................................................. 11

   B.   THIS ACTION SHOULD BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(B)(6)
BECAUSE ARIZONA HAS FAILED TO STATE A CLAIM UPON WHICH RELIEF CAN BE
GRANTED. ................................................................................................................. 13

     *1.   The IRS's administrative position is not arbitrary and capricious.* ................... 13

     *2.   The payments Arizona made in 2023 are includable in income.* ....................... 14

       a)   Arizona's payments are not refunds of state taxes paid. ................................ 14

       b)   Arizona's payments do not qualify for the general welfare exclusion. .......... 17

       c)   Arizona's payments do not qualify as disaster relief. .................................... 19

**IV.  CONCLUSION** ................................................................................................. 20

* * * * * * * * * * * * * * * * * * * * * *

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Bicycle Ass'n v. United States* (*In re Am. Bicycle Ass'n*),
  895 F.2d 1277 (9th Cir. 1990) ....................................................................... 11

*Arford v. United States,*
  934 F.2d 229 (9th Cir. 1991) ............................................................................ 8

*Baur v. Veneman,*
  352 F.3d 625 (2d Cir. 2003) ................................................................................ 4

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ........................................................................................... 13

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................................. 9

*Bob Jones Univ. v. Simon,*
  416 U.S. 725 (1974) ........................................................................................... 10

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ............................................................................................. 7

*Clintwood Elkhorn Mining Co.*, 553 U.S. 1 (2008) ............................................... 9

*Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol &
  Tobacco Tax & Trade Bureau,*
  843 F.3d 810 (9th Cir. 2016) ............................................................................. 12

*De Masters v. Arend,*
  313 F.2d 79 (9th Cir. 1963) ................................................................................. 8

*Dunn & Black, P.S. v. United States,*
  492 F.3d 1084 (9th Cir. 2007) ............................................................................. 8

*Elias v. Connett,*
  908 F.2d 521 (9th Cir. 1990) ............................................................................. 11

*Enochs v. Williams Packing & Navigation Co.,*
  370 U.S. 1 (1962) .......................................................................................... 10, 11

*Fairbanks N. Star Borough v. United States Army Corps of Engineers,*
  543 F.3d 586 (9th Cir. 2008) ............................................................................... 9

*Florida v. Mellon,*
  273 U.S. 12 (1927) ............................................................................................... 5

*Gallo Cattle Co. v. U.S. Dep't of Agric.,*
  159 F.3d 1194 (9th Cir. 1998) ........................................................................... 8, 9

*Ginsburg v. United States,*
  922 F.3d 1320 (Fed. Cir. 2019) ......................................................................... 15

*Hodge v. Dalton,*
  107 F.3d 705 (9th Cir. 1997) ............................................................................... 7

*Hughes v. United States,*
  953 F.2d 531 (9th Cir. 1992) ............................................................................... 8

*J&G Sales Ltd. v. Truscott,*
  473 F.3d 1043 (9th Cir. 2007) ........................................................................... 13

*King Mountain Tobacco Comp. Inc., v. Alcohol and Tobacco Tax and
  Trade Bureau,*
  No. CV-11-3038, 2012 WL 12951864 (E.D. Wash. Sept. 24, 2012) ..................... 8

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................................ 4

*Maines v. Comm'r*,
   144 T.C. 123 No. 8 (2015) ............................................... 14, 15, 16, 17

*Maryland v. Louisiana*,
   451 U.S. 725 (1981) ................................................................................ 4

*McMaster v. Coca-Cola Bottling Co. of California*,
   392 F. Supp. 2d 1107 (N.D. Cal. 2005) ................................................ 8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
   463 U.S. 29 (1983) ............................................................................... 13

*Navajo Nation v. Dep't of the Interior*,
   876 F.3d 1144 (9th Cir. 2012) .............................................................. 8

*Navarro v. Block*,
   250 F.3d 729 (9th Cir. 2001) .............................................................. 13

*New York v. Yellen*,
   15 F.4th 569 (2d Cir. 2021) .................................................................. 5

*Pennsylvania v. New Jersey*,
   426 U.S. 660 (1976) ........................................................................... 4, 5

*Roberts v. Corrothers*,
   812 F.2d 1173 (9th Cir. 1987) .............................................................. 2

*San Luis & Delta-Mendota Water Auth. V. Jewell*,
   747 F.3d 581 (9th Cir. 2014) .............................................................. 13

*Schmier v. United States*,
   279 F.3d 817 (9th Cir. 2002) ................................................................ 4

*Sokolow v. United States*,
   169 F.3d 663 (9th Cir. 1999) .............................................................. 11

*Sotiropoulos v. Comm'r*,
   T.C. Memo 2017-75, 2017 WL 1628515 .............................................. 15

*South Carolina v. Regan*,
   465 U.S. 367 (1984) ................................................................. 10, 11, 12

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001) .............................................................. 13

*Tucson v. City of Seattle*,
   91 F.4th 1318 (9th Cir. 2024) .............................................................. 6

*U.S. Army Corps of Engineers v. Hawkes Co.*,
   578 U.S. 590 (2016) ............................................................................... 9

*United States v. Am. Friends Serv. Comm.*,
   419 U.S. 7 (1974) ................................................................................. 11

*United States v. Burke,*
  504 U.S. 229 (1992) ................................................................ 14

*United States v. Testan,*
  424 U.S. 392 (1976) .................................................................. 3

*Warth v. Seldin,*
  422 U.S. 490 (1975) .................................................................. 4

*Washington Env't. Council v. Bellon,*
  732 F.3d 1131 (9th Cir. 2013) ................................................ 6

*Wyoming v. Oklahoma,*
  502 U.S. 437 (1992) .................................................................. 5

**Statutes**

26 U.S.C. § 61 ...........................................................................*passim*

26 U.S.C. § 139 .................................................................... 19, 20

26 U.S.C. §§ 162(c)(3) .............................................................. 14

26 U.S.C. § 165(i)(5)(A) ........................................................... 19

26 U.S.C.§ 6041(a) ................................................................... 6, 7

26 U.S.C. § 6050E ....................................................................... 7

26 U.S.C. § 6213(a) ................................................................... 10

26 U.S.C. § 7422 ......................................................................... 9

26 U.S.C. § 7604 ....................................................................... 10

28 U.S.C.§ 1331 ................................................................... 3, 7, 8

28 U.S.C.§ 1340 ................................................................... 3, 7, 8

28 U.S.C. § 1343 ......................................................................... 8

28 U.S.C. § 1346(a)(1) ................................................................ 9

Administrative Procedure Act (5 U.S.C. § 701 *et seq.*) ............................................*passim*

Anti-Injunction Act (26 U.S.C. § 7421) ........................................*passim*

Declaratory Judgment Act (28 U.S.C. § 2201) ....................... 1, 10, 13

Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. § 5121
  *et seq.*) ................................................................................. 19

**Other Authorities**

CCA 200908025 ........................................................................ 17

Fed. R. Civ. P. 12(b) .................................................................... 1

Fed. R. Civ. P. 12(b)(1) ................................................................... 3

Fed. R. Civ. P. 12(b)(6) ................................................................. 13

Notice 2002-76, 2002-2 C.B. 917 ................................................... 19

Notice 2023-56, 2023-38 I.R. ................................................... 14, 15

Rev. Rul. 70-86, 1970-1 C.B. 23 ................................................... 14

Rev. Rul. 76-395, 1976-2 C.B. 16 ................................................. 17

Rev. Rul. 78-170, 1978-1 C.B. 24 ................................................. 17

Rev. Rul. 2005-46, 2005-2 C.B 120 .............................................. 17

Treas. Reg. § 1.6041-1 ..................................................................... 6

The United States of America, pursuant to Fed. R. Civ. P. 12(b), moves to dismiss the State of Arizona's complaint with prejudice.

## I.      INTRODUCTION

By its complaint, Arizona seeks injunctive, declaratory, and monetary relief from the IRS's advised tax treatment of payments Arizona made to its residents in 2023. The Court has already considered whether it has the requisite subject-matter jurisdiction to hear this case and correctly concluded that it is unlikely that it does. ECF No. 29 (Order). Not only is the Court's initial conclusion correct, but there are also multiple other reasons dismissal is the right result. Arizona has failed to establish standing to sue. Arizona has also failed to establish a waiver of sovereign immunity. The complaint violates the Anti-Injunction Act ("AIA") and the Declaratory Judgment Act ("DJA"), which broadly prohibit suits seeking injunctive and declaratory relief from the application of federal tax laws. Even if the Court had jurisdiction to hear the case, Arizona's complaint fails to state a claim upon which relief can be granted because the payments it made to its residents are includable in income and do not qualify for any special exclusion from income. These defects are not curable, so Arizona's complaint should be dismissed with prejudice.[1]

## II.      STATEMENT OF FACTS

Arizona alleges that because of a budget surplus, it made one-time payments in 2023 to its taxpayers who had dependents, met the income threshold to claim the Arizona Dependent Tax Credit, had a state tax liability of at least $1 in 2019, 2020, or 2021, and claimed at least one dependent in 2021. ECF No. 1 (Complaint), ¶¶ 2, 29. The payment amount was $250 for each dependent under age 17 and $100 for dependents over 17 and was capped at $750 per taxpayer and other than the nominal $1 threshold requirement, was not tied to the amount of state taxes paid. *Id.* ¶ 30. The payments were income limited: eligibility for the payments phased out at $400,000 for married taxpayers filing

---

[1] In compliance with LRCiv 12.1(c), the parties met and conferred by telephone on April. 10, 2024, and were unable to agree that the complaint was curable in any part by a permissible amendment offered by Arizona.

jointly and $200,000 for all other filers. ECF No. 18-1, Ex. 12.[2] These amounts exceed the "median adjusted gross income ('AGI') for Arizona filers ($30,000 single, $94,000 married filing jointly for 2021) … [and] 98% of Arizona single filers had AGI below $200,000 and 95% of married joint filers had AGI below $400,000 in 2021." *Id.* "Arizona residents that had no tax liability in 2019-2021 were not eligible to receive a payment." *Id.* The stated purpose for the payments was that "[i]nflation is at a forty-year high, putting gas, groceries and other necessities out of reach for many Arizonans. . . . Responsible budgeting [] allowed th[e] state to take action to mitigate the harmful impacts of inflation by returning a portion of the surplus to this state's taxpayers with dependents." Complaint ¶ 33.

Arizona acknowledges that in August 2023 (after enacting the legislation that authorized the payments but before the payments were made), the IRS issued Notice 2023-56 which described the rules "the IRS applies in determining the federal income tax consequences of refunds of State or local taxes and certain other payments made by State or local governments . . . to individuals." *Id.* ¶ 36. Arizona admits that the Notice stated that previous permissive guidance given to other states about payments made in 2022 applied only to payments made in 2022. *Id.* ¶ 40.

Even so, Arizona sought the IRS's advice on the federal tax treatment of its payment and in December 2023 was advised that the IRS considered the payment "federally taxable in full." *Id.* ¶ 58. Arizona made Forms 1099 available to Arizona taxpayers who received a payment. *Id.* ¶ 61.

Arizona now seeks injunctive and declaratory relief to stop the IRS from enforcing its position that the payments are includible in taxpayer income and subject to federal income tax. *Id.* at p. 19. Arizona also seeks refunds of the taxes paid on the payments on behalf of its taxpayers. *Id.*

---

[2] The United States incorporates the facts and evidence submitted by the parties related to the motion for preliminary injunction (ECF Nos. 18, 24, 27) and the findings in the Court's Order (ECF No. 29) denying that motion. Courts can consider extrinsic evidence in determining whether jurisdiction supports hearing a case. *See Roberts v. Corrothers*, 812 F.2d 1173, 1777 (9th Cir. 1987).

Jurisdiction is alleged under 28 U.S.C. §§ 1331 and 1340. *Id.* ¶ 9. Arizona states five counts: the first two for violations of 26 U.S.C. § 61 (which defines "Gross Income"), two others for violations of Congress' taxing power and equal sovereignty, and the final count for violation of 5 U.S.C. § 706. *Id.* ¶¶ 90-122. Arizona alleges that the IRS's advised tax treatment has caused it substantial and ongoing harm. *Id.* ¶¶ 100, 106, 113, 118, 122.

Arizona identifies three alleged harms. The first alleged harm is a loss of "approximately $480,000 in State and local transaction privilege tax revenue that would have been derived from taxpayers' spending." *Id.* ¶ 77. Arizona does not explain how it determined this number but does allege that had the recipients not paid federal tax on the payment, they would have: spent the federal tax amount as they saw fit (¶ 75); spent a significant portion on goods and services subject to Arizona's transaction privilege taxes (¶ 76); used the amount to pay property, licensing, and other taxes in Arizona (¶ 76): and spent generally "in a manner that promoted Arizona's economy and their own wellbeing." *Id.* ¶ 78. Arizona does not explain how it determined these results would have occurred but for the payment of federal income tax. Arizona's second alleged harm is that it had to provide Forms 1099 to its taxpayers who received a payment. *Id.* ¶ 79. Arizona's third alleged harm is to its equal sovereignty. *Id.* ¶¶ 114-118.

## III.    ARGUMENT

### A.    This action should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) because Arizona has failed to establish subject-matter jurisdiction.

This action should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) because the Court lacks subject-matter jurisdiction. On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), the plaintiff bears the burden of establishing subject-matter jurisdiction and asserting a waiver of sovereign immunity. Yet Arizona's complaint fails to establish standing or assert any such waiver of sovereign immunity by the United States. Arizona has thus failed to satisfy the requirements necessary to meet its burden of showing that the Court may exercise subject-matter jurisdiction over the complaint. *See United States v. Testan*, 424 U.S. 392, 399 (1976).

1
          *1.    Arizona lacks standing.*

2
     A plaintiff must have "a personal stake in the outcome of the controversy' [so] as

3
to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490,

4
498 (1975). At its "irreducible constitutional minimum," Article III standing requires a

5
plaintiff, as the party invoking the Court's jurisdiction, to establish: (1) a concrete and

6
particularized injury-in-fact, either actual or imminent; (2) a causal connection between

7
the injury and defendant's challenged conduct, such that the injury is "fairly traceable to

8
the challenged action of the defendant"; and (3) a likelihood that the injury suffered will

9
be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

10
560-61 (1992). "At the pleading stage, general factual allegations of injury resulting from

11
the defendant's conduct may suffice," *id.* at 504 U.S. at 561, but "a plaintiff cannot rely

12
solely on conclusory allegations of injury." *Baur v. Veneman*, 352 F.3d 625, 637 (2d Cir.

13
2003); *see Schmier v. United States*, 279 F.3d 817, 826 (9th Cir. 2002) (rejecting

14
conclusory allegations).

15
     Arizona has not met its burden. It challenges the IRS's administrative position that

16
the 2023 payments Arizona made are includable in the recipients' income and thus may

17
result in federal income tax liability. But recognizing that it cannot mount that challenge

18
directly, it claims injury by the IRS because it *may* have lost $480,000 in sales tax

19
revenue and it made available Forms 1099 to affected taxpayers. Complaint ¶¶ 77, 79.

20
Neither of these harms is enough to confer standing as the Court has already correctly

21
concluded. Order at 6-7.

22
     To begin, states may sue the federal government only to vindicate their sovereign

23
or quasi-sovereign interests, not to litigate the personal claims of their taxpayers. *See,*

24
*e.g.*, *Maryland v. Louisiana*, 451 U.S. 725, 737 (1981) (a state cannot interject itself into

25
a controversy "as a nominal party in order to forward the claims of individual citizens");

26
*Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976) (it has "become settled doctrine

27
that a State has standing to sue only when its sovereign or quasi-sovereign interests are

28
implicated and it is not merely litigating as a volunteer [for] the personal claims of its

citizens"). Therefore, Arizona may not predicate standing on its residents' alleged increased federal tax liability.

The complaint does not sufficiently allege that the IRS's suggested tax treatment will cause Arizona to suffer "a direct injury in the form of a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (considering the alleged loss of severance tax revenues linked to coal extraction and sale). The Court already correctly concluded that Arizona's "alleged loss of transaction privilege taxes flows directly from the tax treatment of its taxpayers and is wholly derivative of its taxpayer's injuries." Order at 6:24-7:1. The Court's conclusion is consistent with other authority finding that a speculative decline in general tax revenues is not an adequate injury-in-fact. *See Florida v. Mellon*, 273 U.S. 12, 17-18 (1927) (rejecting Florida's claim of direct injury predicated on anticipated loss of tax revenue attributable to residents leaving the state because of the new federal inheritance tax). Even if Arizona could show a decline in revenue, it was self-inflicted because Arizona's legislature chose a form of payment that didn't satisfy longstanding principles for exclusion from income. Self-inflicted harms to the state fisc cannot confer standing. *Pennsylvania*, 426 U.S. at 664.

Any reliance on the Second Circuit's decision in *New York v. Yellen*, 15 F.4th 569, 576-77 (2d Cir. 2021) is misplaced. There the plaintiff states alleged a *direct* injury to their taxing authority separate from the higher taxes their residents would pay because *Congress* decreased the deduction for state and local taxes. Arizona has only alleged an injury derivative of its residents paying higher taxes because of Arizona's choices about how to design its "rebate" program. But if this is a sufficient injury for a state to allege for standing purposes, then each year any state could manufacture standing to challenge any IRS position that resulted in its residents paying higher taxes. This result would upend tax procedure and render Article III's injury requirement meaningless.

And Arizona has offered the Court only a bare and speculative estimate of $480,000 in lost sales tax revenue. Complaint ¶ 77. But such injury is purely conjectural and hypothetical, unlike in *New York* where the plaintiff states provided robust expert

5

declarations with detailed analysis. Many factors affect whether Arizona taxpayers would pay federal income tax on the payments received. Those include, for example, whether: (1) they had sufficient income in 2023 to be subject to federal income tax, (2) they report the payments as income, (3) they have losses or credits that would offset any additional tax attributable to treatment of the payments as income, and (4) the IRS pursues any adjustments if they do not report the payments as income. It is pure speculation to suggest any federal tax treatment would change how payment recipients spend money in Arizona.

Arizona's alleged loss of sales tax revenue cannot be causally connected to the IRS's advice. To satisfy the causality element for Article III standing, Arizona must show that its injury is causally linked or "fairly traceable" to the IRS's administrative position. *Washington Env't. Council v. Bellon*, 732 F.3d 1131, 1141-42 (9th Cir. 2013). Arizona's complaint suggests a direct link from the amount of tax paid to the amount of tax revenue Arizona allegedly lost. But such a dollar-for-dollar analysis is oversimplistic. As described, many factors affect whether Arizona taxpayers would pay federal income tax on the payments received. And Arizona has not alleged that it took any of those factors into consideration in determining its "loss."

Arizona not only cannot establish a loss of sales tax revenue traceable to the IRS's conduct, but it also cannot establish any injury redressable by the Court. "Redressability asks whether the district court had the power to prevent the injury at the time the complaint was filed." *Tucson v. City of Seattle*, 91 F.4th 1318, 1325 (9th Cir. 2024). Even if the IRS were to change its position and declare that it would not challenge exclusion of the payments from income, that doesn't guarantee the payment recipients will spend more money in Arizona. Arizona's standing theory requires too much guesswork for how independent decision makers will exercise their judgment.

So too Arizona's complaints about issuing Forms 1099. First, that has already happened, and there is no undoing it. Moreover, as the Court correctly concluded, the obligation to make available Forms 1099-MISC to the recipients of payments of $600 or more followed from the application of 26 U.S.C. § 6041(a) and Treas. Reg. § 1.6041-

1(b)(1) and (i) and did not result solely from the IRS's administrative position. Order at

7:11-13. If the payments Arizona made were, as it contends, refunds of state taxes paid

and were $10 or more, then it would have had to report those payments to the IRS and

make Forms 1099 available to recipients who claimed itemized deductions. 26 U.S.C.

§ 6050E. Those forms would have just been Forms 1099-G instead of Forms 1099-MISC.

Instead, based on the IRS advice to Arizona that its payments were not properly

considered refunds of taxes paid, it needed to file and make available Forms 1099-MISC

only for taxpayers who received $600 or more. 26 U.S.C. § 6041(a). Arizona had to

generate Forms 1099 regardless of the IRS's suggested tax treatment. And it had to

generate these forms because of a statutory reporting requirement, not because of the

advice it received.

Arizona's allegations thus rely on an impermissible "highly attenuated chain of

possibilities" and fail to satisfy the Article III requirement of an injury to support

standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

> ### 2.   *Arizona has failed to establish a waiver of sovereign immunity.*

The United States can be sued only if it waives its sovereign immunity. The

doctrine of sovereign immunity precludes suit against both federal agencies and their

employees, if acting in their official capacities.[3] *Hodge v. Dalton*, 107 F.3d 705, 707 (9th

Cir. 1997). Arizona alleges jurisdiction under 28 U.S.C.§§ 1331 and 1340. Complaint

¶ 9. Although 28 U.S.C. § 1331 provides that "[t]he district courts shall have original

jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the

United States," and 28 U.S.C. § 1340 generally confers jurisdiction for matters arising

---

[3] The government officials Arizona has named as defendants are being sued in connection with doing their jobs, and as such, the suit against the Commissioner of Internal Revenue Daniel Werfel and the Secretary of the Treasury Janet Yellen must be dismissed. Arizona's suit against Commissioner Werfel and Secretary Yellen is based solely on their official capacities and, as such, is a suit against the United States. There is no suggestion in Arizona's complaint that Commissioner Werfel or Secretary Yellen acted outside the scope of their employment or otherwise outside of their official capacities. Indeed, the complaint only references Commissioner Werfel and Secretary Yellen in the caption and then identifies them as parties (in their official capacities); it contains no allegations at all regarding any specific actions by either. Complaint ¶¶ 12, 14.

under the internal revenue laws, the United States has not waived its sovereign immunity through general jurisdictional statutes. *See Hughes v. United States*, 953 F.2d 531, 539 n.5 (9th Cir. 1992) (neither 28 U.S.C. §§ 1331 nor 1340 nor 1343 waives sovereign immunity); *see also Dunn & Black, P.S. v. United States*, 492 F.3d 1084, 1088 n.3 (9th Cir. 2007); *Arford v. United States*, 934 F.2d 229, 231 (9th Cir. 1991); *De Masters v. Arend*, 313 F.2d 79, 84 (9th Cir. 1963). Arizona has expressly alleged two causes of action under § 61. Its third and fourth causes of action allege violations of Congress' Taxing Power and Arizona's equal sovereignty, but the allegations for both read in substance as challenges to income determinations under § 61. Section 61, however, does not provide a cause of action and certainly does not provide a waiver of sovereign immunity. *Cf. McMaster v. Coca-Cola Bottling Co. of California*, 392 F. Supp. 2d 1107, 1112 (N.D. Cal. 2005). Finally, although 5 U.S.C. § 702 can serve generally as a waiver for Administrative Procedure Act ("APA") claims in some cases, it does not in this case, for the reasons discussed below.

3.      *There is no waiver of sovereign immunity under the APA.*

Arizona seeks injunctive, declaratory, and monetary relief under the APA, but the APA does not provide an avenue for relief, and sovereign immunity is not waived, where: (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law. 5 U.S.C. § 701(a).[4] In addition, the APA does not apply if the decision under review is not made reviewable by statute and a "final agency action for which there is no other adequate remedy in a court...." 5 U.S.C. § 704; *Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998). Two conditions must be satisfied for an agency action to be final. First, the action must mark the consummation of the agency's

---

[4] Arizona did not allege but may argue that a waiver of sovereign immunity is found under 5 U.S.C. § 702. The Ninth Circuit has read § 702 to provide a waiver for claims that do not arise under the APA and are non-monetary. *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1172 (9th Cir. 2012). Because Arizona is seeking refunds of taxes paid on behalf of its taxpayers, that claim is monetary and § 702 does not waive the United States' sovereign immunity. *King Mountain Tobacco Comp. Inc., v. Alcohol and Tobacco Tax and Trade Bureau*, No. CV-11-3038, 2012 WL 12951864, at *3 (E.D. Wash. Sept. 24, 2012).

decision-making process. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow. *See Gallo*, 159 F.3d at 1198–99; *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (overruled on other grounds). Thus, even an "ultimate administrative position" is not final for purposes of the APA unless it is one "by which 'rights or obligations have been determined.'" *Fairbanks N. Star Borough v. United States Army Corps of Engineers*, 543 F.3d 586, 591, 593 (9th Cir. 2008) (quoting *Bennett*, 520 U.S. at 178) (dismissing a claim challenging agency action because it was not "final" on that standard). The IRS advice that the payments here should be included in federal income was not a final agency action. That advice is just the IRS's administrative position about the tax treatment of the payments Arizona made. It does not determine any of Arizona's rights or obligations. It also has no legal consequence for the recipients of payments who are free to take a different position on their tax return and obtain a determination through the IRS examination process and administrative appeals process, and ultimately from a court. Accordingly, the IRS's administrative position is not final agency action.

"Even if final, agency action is reviewable under the APA only if there are no adequate alternatives to APA review in court." *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 600 (2016); 5 U.S.C. § 704. Here, the tax consequence of a taxpayer including (or not including) the amount of the payment received in income will be determined via their 2023 tax return. Taxpayers may omit the payment and defend the omission in the Tax Court or report the payment and "bring an action against the Government either in United States district court or in the United States Court of Federal Claims," provided they "comply with the tax refund scheme established in the Code." *Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 4-5 (2008) (referencing 28 U.S.C. § 1346(a)(1), 26 U.S.C. § 7422, and the jurisdictional prerequisite for such a suit.). The IRS's administrative position is not a final agency action for which there is no adequate remedy because Arizona taxpayers can sue to challenge the IRS's position.

####         4.       *The AIA and DJA bar Arizona's complaint.*

Even if Arizona has standing to sue and the APA provided an avenue for review, the Court still lacks jurisdiction because the complaint is barred by the AIA and the DJA. The AIA provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). "The manifest purpose of [the AIA] is to permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund." *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7 (1962). If the AIA applies, federal courts lack jurisdiction. *See id.* at 5.

The DJA, 28 U.S.C. § 2201(a), bars declaratory relief related to federal taxes. As the Supreme Court noted in *Bob Jones Univ. v. Simon*, 416 U.S. 725, 732 n.7 (1974), the tax exception to the DJA demonstrates the "congressional antipathy for premature interference with the assessment or collection of any federal tax." The scope of the DJA is at least as broad as that of the AIA. *Id.* The Supreme Court has interpreted the AIA and DJA broadly, to protect the Treasury from suits seeking to interject the courts prematurely into federal tax disputes. In doing so, the Court has confined tax litigation to the precise channels prescribed by Congress, such as suits for refund, *Bob Jones Univ.*, 416 U.S. at 746, pre-assessment summons enforcement suits in federal district court, 26 U.S.C. § 7604, and pre-assessment Tax Court deficiency proceedings, 26 U.S.C. § 6213(a).

Arizona seeks to restrain "the assessment or collection of [a] tax" by seeking to "[e]njoin the IRS from enforcing its unlawful determination and to refund amounts that have been unlawfully collected." Complaint, Prayer for Relief at b. And states are among the "persons" to which the AIA applies. *See South Carolina v. Regan*, 465 U.S. 367, 373-81 (1984). Arizona's complaint falls squarely within the AIA and DJA's prohibitions. *See Bob Jones Univ.*, 416 U.S. at 738-39, 749.

5.     *No judicial exception to the AIA authorizes this suit.*

       a)     The *Williams Packing* exception does not apply.

Courts have implied a narrow exception to the AIA under *Williams Packing*, 370 U.S. 1, if two things can be shown: (1) that "under no circumstances" can the United States ultimately prevail on the merits of the case, and (2) that equity jurisdiction otherwise exists—that the taxpayer is threatened with irreparable harm and no adequate legal remedy is available. *Williams Packing*, 370 U.S. at 6-8; *Elias v. Connett*, 908 F.2d 521, 525 (9th Cir. 1990). The AIA's plain language and legislative purpose require strict construction of any judicially created exceptions. *See Am. Bicycle Ass'n v. United States* (*In re Am. Bicycle Ass'n*), 895 F.2d 1277, 1281 (9th Cir. 1990).

"Under no circumstances" means that "under the most liberal view of the law and the facts . . . the United States cannot establish its claim." *United States v. Am. Friends Serv. Comm.*, 419 U.S. 7, 10 (1974). To rebut such a contention, the United States need only show that it has a good faith basis for its position, not that it would necessarily prevail. *Elias*, 908 F.2d at 525. It is not sufficient under *Williams Packing* for Arizona to allege that it will win on the merits. Instead, it has a higher standard to meet—it must allege that under no circumstances can it lose on the merits. Arizona has made no such allegation in its complaint, nor can it. And, as discussed, taxpayers have adequate legal remedies available to them to challenge the assessment and collection of any income tax, precluding reliance on *Williams Packing*. *E.g.*, *Sokolow v. United States*, 169 F.3d 663, 665 (9th Cir. 1999) (citations omitted).

       b)     The *Regan* exception does not apply.

Arizona also cannot invoke the second narrow judicially created exception to the AIA. In *South Carolina v. Regan*, the Supreme Court considered a constitutional challenge to a statute that eliminated a federal tax exemption for interest on unregistered "bearer" bonds, restricting the exemption to bonds whose ownership was registered. 465 U.S. at 371. South Carolina asserted a sovereign interest in issuing bonds in the form of its choice. *Id.* at 371-72. The Court held that the AIA did not bar South Carolina's suit

(though it ultimately rejected the state's claim on the merits) because applying the AIA would have risked precluding all judicial review of the statute. *See id.* at 373.

This case is also different from *Regan* because the violation of a supposedly sovereign interest asserted by Arizona (speculative loss of sales tax revenue) is an alleged secondary consequence of the possible increase in some of its *residents'* federal taxes. In contrast, the sovereign interest in *Regan* went to the *state's* issuance of bonds in a form that would require the *state* to pay more. Simply put, *Regan* does not stand for the principle that a state can sue anytime its residents' federal taxes increase. Sanctioning an AIA workaround in these circumstances would be anything but narrow and open the floodgates to state-sponsored tax suits on their residents' behalf.

Yet any Arizona taxpayers who include the payment in income and pay more federal tax—unlike Arizona itself—have a direct economic interest in challenging the IRS's tax treatment. Unlike in *Regan*, Arizona need not struggle to "convince a taxpayer to raise [its] claims," nor can Arizona show such a challenge is a possibility so remote that the tax treatment would remain unreviewed. *Cf. Regan*, 465 U.S. at 380-81. As the Ninth Circuit ruled in similar circumstances:

> [*Regan's*] narrow exception is inapplicable here. Most critically, in *Regan*, the state's interest in issuing bonds in the form it chose existed separately from the bondholders' interest in avoiding taxation. A bondholder could avoid taxation simply by purchasing registered bonds, and thus would have little incentive to pay the tax, file a refund suit, and raise the state's constitutional claims. Therefore, the state would be required to depend on the mere *possibility* of persuading a third party bondholder to assert its claims. Here, in contrast, the Yakama Nation's asserted injury flows from the taxation of its members, and thus is wholly derivative of any injury suffered by [the members].

*Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax & Trade Bureau*, 843 F.3d 810, 815 (9th Cir. 2016) (emphasis in original).

As this Court correctly concluded in denying the request for a preliminary injunction, "*Yakama Nation* is difficult to fairly distinguish from the facts here." Order at 6:10. Here, as in *Yakama*, the places of the state and the individual taxpayers are reversed compared to *Regan*: the individual taxpayers are directly affected by a possible tax

treatment, while Arizona's asserted sovereign interests are at best secondary or derivative. Similarly, Arizona's desire for its residents to not pay federal income tax on its payments is duplicative of those residents' own interests in minimizing their taxes through Congressionally approved channels. The AIA and DJA therefore bar this suit.

**B.     This action should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because Arizona has failed to state a claim upon which relief can be granted.**

A dismissal for failure to state a claim is appropriate where, as here, Arizona can prove no set of facts that would entitle it to relief because it fails to state a cognizable legal theory or fails to allege sufficient facts under a cognizable legal theory. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). As the Supreme Court noted in *Bell Atlantic Corp. v. Twombly*, to survive a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. 544, 545 (2007). Arizona fails to state a claim upon which relief may be granted, even if it had not failed to establish that this Court may exercise subject-matter jurisdiction over its claims.

*1.     The IRS's administrative position is not arbitrary and capricious.*

Even if the IRS's administrative position were reviewable under the APA, relief would not be warranted because it is not arbitrary and capricious. Under the "arbitrary and capricious" standard, a court may not set aside an agency decision that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 42 (1983). Although the court's inquiry is thorough, this "standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity and we may not substitute our judgment for that of the agency." *San Luis & Delta-Mendota Water Auth. V. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). "Where the agency's line-drawing does not appear irrational and the [party challenging the agency action] has not shown that the consequences of the line-drawing are in any respect dire … [courts] will leave that line-drawing to the agency's discretion." *J&G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1052 (9th Cir. 2007) (citation omitted). As discussed further below, the IRS's

administrative position, that the Arizona payments do not qualify as refunds or for the general welfare or disaster relief exclusions, is based on the IRS's rational and reasoned analysis and is not arbitrary or capricious.

2. *The payments Arizona made in 2023 are includable in income.*

Each year states make payments of various types. These payments could represent salaries, subsidies, payments for good and services, credits against future tax, and even refunds of prior taxes paid. And it is the IRS's job each year to determine the proper federal tax treatment for each of these state payments when they are reported or omitted as income on a tax return. Under 26 U.S.C. § 61(a) gross income means all income from whatever source derived, unless excluded by law. The term "income" "sweeps broadly" and encompasses "any accession to wealth." *United States v. Burke*, 504 U.S. 229, 233 (1992). The payments made by Arizona at issue here are income because in substance they are not refunds of state tax paid and fall outside any income exclusion.

a) Arizona's payments are not refunds of state taxes paid.

Generally, state tax refunds[5] are not includable in a taxpayer's income because, as the return of an overpayment of the taxpayer's state tax liability, a refund is not an accession to wealth. *See* Notice 2023-56, 2023-38 I.R.B 824; Rev. Rul. 70-86, 1970-1 C.B. 23. Yet a state's characterization of a payment (*e.g.*, refunds, overpayments, or "rebates") is not determinative for federal income tax purposes. *Maines v. Comm'r*, 144 T.C. 123, 132 No. 8 (2015). Rather, federal tax law looks to the substance of the payments to determine the legal interests and relationships established under the state law. *Id.* For example, when a state law authorizes payments to taxpayers that are limited dollar-for-dollar to individuals' previously paid state tax liabilities, the payments are

---

[5] States and tax practitioners may use the term "rebate" in connection with state tax refunds. Though the term "rebate" is used in the Code (*e.g.*, 26 U.S.C. §§ 162(c)(3) (denying deductions for any "kickback, rebate, or bribe" meeting certain criteria) & 6664(a)(2) (defining underpayments for penalty purposes)), it is conceptually distinct from how the term is used by Arizona here. To the extent the payments Arizona made are not refunds for federal income tax purposes, they are likewise not "rebates." Put differently, whether the payment is called a "rebate" or a refund is irrelevant to the analysis here.

treated as state tax refunds for federal income tax purposes because the purpose of the payment is to refund amounts previously paid. *See* Notice 2023-56, 2023-38 I.R.B 824; *see also Sotiropoulos v. Comm'r*, T.C. Memo 2017-75, 2017 WL 1628515, at *13 ("a 'refund' is commonly defined to include the return of money to a person who overpaid, such as a taxpayer who overestimated tax liability or whose employer withheld too much tax from earnings").

State law may also authorize credits to a taxpayer that are claimed on a tax return and reduce the current-year tax liability shown as due on the return. *See* Tax credits for individuals: What they mean and how they can help refunds | Internal Revenue Service (irs.gov) [https://perma.cc/YD6S-XCAG]. Credits can be either refundable or non-refundable. *Id.* A non-refundable tax credit only reduces tax liability and cannot result in a payment to the taxpayer exceeding the return of the taxpayer's own prepayment. *Id.* Therefore, a non-refundable tax credit is not includable in income no matter how the credit is calculated. A refundable tax credit, however, can result in the taxpayer receiving more than the return of amounts previously paid. *Id.* Therefore, a refundable tax credit is not income if the taxpayer uses it only to reduce a present year liability. But if a refundable tax credit results in a payment over which the taxpayer has control, that payment is income if it is not limited to prior tax paid and an exclusion does not apply. *Maines*, 144 T.C. at 134 (distinguishing excess of QEZE Real Property Tax Credit from EZ Wage and EZ Investment credits where former was tied dollar-for-dollar to previously paid property tax while latter were not); *Ginsburg v. United States*, 922 F.3d 1320, 1325 (Fed. Cir. 2019) (finding excess over state tax credit to be income because taxpayer had "complete dominion and control" over the excess).

Here, Arizona's law did not generate a credit at all, which distinguishes the payments from all three credits analyzed in *Maines.* Instead, Arizona directed that taxpayers who previously claimed the dependent tax credit in 2021 were to receive a payment in 2023 of up to $750 if they had a tax liability of at least $1 in 2019, 2020, or 2021. Arizona's law did not create a new state tax credit to offset Arizonans' current year

taxes. Arizona also did not create a refund of state taxes paid because it did not cap the amount of its payment at state taxes paid in 2019-2021. The tie to the prior years' tax is tenuous at best requiring a nominal $1 in taxes paid over the three-year period. Accordingly, the payments are not credits or refunds and are included in income for federal income tax purposes.[6]

Arizona claims that the Tax Court's decision in *Maines* dictates that its payments should not be taxable in full, but it misreads and overextends the decision. As noted above, *Maines* dealt exclusively with refundable tax credits that first had to be applied to current year liabilities. And what *Maines* found is "with refundable portions of tax credits, taxpayers may receive cash payments in *excess* of their tax liability. We therefore hold that this excess portion that remains after first reducing state-tax liability and that may be refunded is an accession to the Maineses' wealth, and must be included in their federal gross income under section 61." 144 T.C. at 135-36 (emphasis in original).

Arizona could have designed refundable tax credits to fit within the confines of *Maines*, but it didn't. Instead, it made one-time unrestricted payments in 2023 to taxpayers who claimed a state tax credit on their 2021 tax return and had a state tax liability of the nominal amount of $1 in 2019-2021. Complaint § 2. If Arizona wanted to create a state tax credit to offset liabilities on a tax return and to ease the effects of inflation for its taxpayers, it knew how to do it, having tied the payment at issue to an existing state tax credit. Arizona also could have designed the payments to be limited to previously paid tax so that they would be treated as refunds, but it didn't do that either. Instead, it sent its qualified taxpayers one-time payments in amounts not limited to previously paid taxes, unlike the QEZE property tax credit addressed in *Maines. Maines* thus does not support the proposition that payments like those made by Arizona must be

---

[6] This outcome reflects what the Arizona Legislature understood when it passed the Arizona Families Tax Rebate—that recipients of the payments might include the payment for federal tax purposes in income. ECF No. 18-1, Ex. 8 § 3(I).

treated as refunds or credits that could be excluded from income.[7]

                b)     Arizona's payments do not qualify for the general welfare exclusion.

Although § 61 provides for broad includability in gross income, for nearly 100 years the IRS has allowed certain payments to individuals or families by governmental units under legislatively provided social benefit programs to be excluded from the recipient's gross income under what it calls the general welfare exclusion. In determining whether the general welfare exclusion applies to payments, the IRS generally requires that the payments be: (1) made from a governmental fund; (2) for the promotion of the general welfare (i.e., based on individual or family need rather than to all residents regardless of financial status, health, educational background, or employment status); and (3) not for services that the recipient provides. *See* Rev. Rul. 2005-46, 2005-2 C.B 120; Notice 2023-56.

Payments that are based on some criteria other than individual or family need rarely qualify for the general welfare exclusion. In addition, the exclusion has generally applied to payments for a specific welfare-oriented purpose such as food, medical care, housing, personal property, transportation, funeral expenses, and disaster relief. The IRS has further limited the general welfare exclusion to government programs that make payments to low-income individuals or families.[8]

The 2023 Arizona payments do not qualify for the general welfare exclusion for two reasons. First, the income limitations for the payments are above what is generally considered to be covered by the general welfare exclusion. Eligibility for the payments begins to phase out at $400,000 for married taxpayers filing jointly and $200,000 for all

---

[7] Even if Arizona's payments were considered refunds, taxpayers would not necessarily be able to exclude them from income. They would still have to apply the tax benefit rule to the payments, as explained in *Maines.* 144 T.C. at 138-39.

[8] *See, e.g.*, Rev. Rul. 78-170, 1978-1 C.B. 24 (payments made by the State of Ohio to lower-income, elderly individuals to reduce their cost of winter energy consumption); Rev. Rul. 76-395, 1976-2 C.B. 16 (home rehabilitation grants to low-income families to correct substandard conditions); CCA 200908025 (payments to low-income households for the purchase and installation of energy efficient furnaces and boilers).

other filers. ECF No. 18-1, Ex. 12. Those amounts represent multiples of the median adjusted gross income for Arizona filers and encompass most Arizonans.

Second, Arizona residents that had no tax liability in 2019-2021 were not eligible to receive a payment. As a result, residents with income below the Arizona standard deduction did not receive a payment. This group includes single residents with income below $12,550 and married couples with income below $25,000. *Id.* Thus, rather than targeting relief to low-income residents with dependents, the legislation expressly excludes such low-income residents from receiving the payments, while including almost all similarly situated Arizonans with higher incomes. Because the payments are not based on need, they cannot qualify for the general welfare exclusion.

Arizona summarily alleges it relied on the IRS's tax treatment for the 21 states that issued payments in 2022, during the COVID-19 pandemic and federally declared disaster. Complaint ¶ 80. But facts supporting this "reliance" claim are missing. There is not one reference in the text of the law authorizing the payments to the IRS's statement on the 2022 payments, to the COVID-19 pandemic, or to the federally declared disaster. ECF No. 18-1, Ex. 8. There is no discussion about whether Arizona modeled its program after any of the 21 states that received its desired tax treatment in 2022. There is no mention that Arizona expects these amounts to be excluded from federal income tax based on the general welfare or disaster relief exclusions, and there is no statement that the purpose of these payments was to be refunds of taxes paid. There is no allegation that Arizona declared inflation a state-wide disaster. Instead, the text of the law refers generally to inflation, a budget surplus, and the possibility that the payments will be included in income for federal tax purposes. And it only requires a single dollar of tax liability. *Id.* Arizona's allegation of reliance now for purposes of this lawsuit is not supported by sufficient factual allegations, nor can it be.

Even if Arizona could claim reliance, it would have been misplaced based on the IRS's explanation that its decision not to challenge various state programs in 2022 was made in "the best interest of sound tax administration and given the fact that the

pandemic emergency declaration is ending in May, 2023 making this an issue only for the 2022 tax year." *Id.*, Ex. 1. (I.R. 2023-23). Arizona cannot allege reliance on the guidance and ignorance that the circumstances animating it would not hold for 2023. Arizona does not allege it did not know the relevant criteria for evaluating whether its payments could properly be excluded from income it just seeks a determination those criteria do not apply. No matter what the IRS determined for the 21 states in 2022, longstanding tax principles require that the payments Arizona made in 2023 be evaluated on their own. *See* Notice 2023-56. And because those payments were not based on the financial need of the individual or family receiving them, they cannot qualify for the general welfare exclusion.

c)      Arizona's payments do not qualify as disaster relief.

Section 139(a) provides that gross income does not include any amount received by an individual as a qualified disaster relief payment. 26 U.S.C. § 139(a). Section 139(b)(4) defines a qualified disaster relief payment to include, among other things, any amount paid to or benefiting an individual if such amount is paid by a federal, state, or local government, or agency or instrumentality, in connection with a qualified disaster to promote the general welfare. 26 U.S.C. § 139(b)(4). Under § 139(c)(2), a qualified disaster includes a federally declared disaster as "defined by section 165(i)(5)(A)" of the Code. 26 U.S.C. § 139(c)(2). Section 165(i)(5)(A) defines a federally declared disaster as "any disaster subsequently determined by the President of the United States to warrant assistance by the Federal Government under the Robert T. Stafford Disaster Relief and Emergency Assistance Act." 26 U.S.C. § 165(i)(5)(A).

The remaining criteria for disaster relief payments under § 139(b)(4) are that the payments be made "in connection with" the disaster and that they are made to "promote the general welfare." 26 U.S.C. § 139(b)(4). In the context of a qualified disaster, such as the COVID-19 pandemic, the financial need prong of the general welfare requirement is presumed for all individuals affected by the disaster, and general welfare assistance is allowed for all such individuals. *See* Notice 2002-76, 2002-2 C.B. 917.

The state legislature approved the 2023 Arizona payments the same day the COVID-19 pandemic, a "federally declared disaster" as defined by § 139(c)(2), terminated, and payments were not made until many months later. Moreover, the expressed purpose of the payments was to "mitigate the harmful impacts of inflation." ECF No. 18-1, Ex. 8 § 3(L)(2). The law makes no mention of the federally declared disaster related to the COVID-19 pandemic or any other potentially qualifying event. Plus, it would be nonsensical for a state to exclude its poorest citizens from eligibility for payments tied to disaster relief, as Arizona did here. Because the payments were not made in connection with a declared disaster when the payments were made, they cannot qualify for the disaster relief exclusion. And as with the general welfare exclusion, Arizona's reliance claim lacks merit.

## IV.   CONCLUSION

Arizona's complaint should be dismissed with prejudice under Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure because it lacks standing, cannot identify a waiver of the United States' sovereign immunity, the AIA and DJA bar it, and the payments are properly includable in income.

DATED this 29th of April, 2024

DAVID A. HUBBERT
Deputy Assistant Attorney General

*/s/ Amy Matchison*
AMY MATCHISON
Trial Attorney, Tax Division
U.S. Department of Justice