DAVID A. HUBBERT
Deputy Assistant Attorney General

AMY MATCHISON
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 683
Washington, D.C. 20044
Telephone:   (202) 307-6422
Fax:           (202) 307-0054
Email:   Amy.T.Matchison@usdoj.gov
            Western.Taxcivil@usdoj.gov

*Attorneys for United States of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona, | Case No. 2:24-cv-00355-PHX-GMS |
| Plaintiff, | **UNITED STATES' REPLY IN SUPPORT OF MOTION TO DISMISS** |
| v. | |
| United States Internal Revenue Service; Daniel I. Werfel, in his official capacity as Commissioner of the United States Internal Revenue Service; the United States Department of Treasury; Janet L. Yellen, in her official capacity as Secretary of the United States Department of Treasury; and the United States of America, | |
| Defendants. | |

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................... 1

II.   ARGUMENT ............................................................................................................. 1

   A.   This Court lacks jurisdiction over Arizona's complaint. ......................................... 1

      1.   *Arizona cannot show it has standing.* ............................................................. *1*

      2.   *Arizona has also failed to establish a waiver of sovereign immunity.* ................ 4

      3.   *There is no relief available to Arizona under the APA.* ..................................... 6

      4.   *The AIA and DJA indeed bar Arizona's complaint.* ......................................... 8

         a)   Arizona's arguments that the *Regan* exception applies fail. ........................... 8

         b)   The *Williams Packing* exception likewise does not apply. ........................... 13

   B.   Arizona fails to state a claim. ............................................................................. 13

      1.   *Arizona's payments are not refunds of state taxes paid.* .............................. 13

      2.   *Arizona's payments do not qualify for the general welfare exclusion.* ............. 14

      3.   *Arizona's payments do not qualify as disaster relief.* ................................... 16

      4.   *Arizona fails to state statutory and constitutional claims.* ............................ 17

III.  CONCLUSION ......................................................................................................... 18

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Johnson,*
   355 F.3d 1179 (9th Cir. 2004) ............................................................................. 6

*Bennett v. Spear,*
   520 U.S. 154 (1997) ........................................................................................... 6

*Caterpillar Tractor Co. v. United States,*
   589 F.2d 1040 (Ct. Cl. 1978) .............................................................................. 7

*Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol &*
   *Tobacco Tax & Trade Bureau,*
   843 F.3d 810 (9th Cir. 2016) ................................................................ 8, 10, 12

*Elias v. Connett,*
   908 F.2d 521 (9th Cir. 1990) ................................................................ 13

*Enochs v. William Packing & Navigation Co.,*
   370 U.S. 1 (1962) .................................................................................. 13

*Fargo v. Comm'r,*
   447 F.3d 706 (9th Cir. 2006) ................................................................ 5

*Frank Lloyd Wright Found. v. Kroeter,*
   697 F. Supp. 2d 1118 (D. Ariz. 2010) ................................................ 13

*Gallo Cattle Co. v. U.S. Dep't of Agric.,*
   159 F.3d 1194 (9th Cir. 1998) .............................................................. 6

*Hodge v. Dalton,*
   107 F.3d 705 (9th Cir. 1997) ................................................................ 4

*King Mountain Tobacco Comp. Inc., v. Alcohol and Tobacco Tax and*
   *Trade Bureau,*
   No. CV-11-3038, 2012 WL 12951864 (E.D. Wash. Sept. 24, 2012) .......................... 5

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) .............................................................................. 1

*Maines v. Comm'r,*
   144 T.C. 123 (2015) ............................................................................ 13, 14

*Mashantucket Pequot Tribe v. Town of Ledyard,*
   722 F.3d 457 (2d Cir. 2013) ................................................................ 9

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) .............................................................................. 9

*McMaster v. Coca-Cola Bottling Co. of California,*
   392 F. Supp. 2d 1107 (N.D. Cal. 2005) .............................................. 5

*Michigan v. Bay Mills Indian Cmty.,*
   572 U.S. 782 (2014) .............................................................................. 8

*Navajo Nation v. Dep't of the Interior,*
   876 F.3d 1144 (9th Cir. 2012) .............................................................. 5

iii

*New York v. Yellen*,
    15 F.4th 569 (2d Cir. 2021) ........................................................................ 3

*NW. Austin Mun. Util. Dist. No. One v. Holder*,
    557 U.S. 193 (2009).................................................................................. 11

*Pauma v. Nat'l Lab. Rels. Bd.*,
    888 F.3d 1066 (9th Cir. 2018) .................................................................... 8

*Perlowin v. Sassi*,
    711 F.2d 910 (9th Cir. 1983) .................................................................... 12

*South Carolina v. Regan*,
    465 U.S. 367 (1984)............................................................................*passim*

*Texas v. Yellen*,
    2022 WL 989733 (N.D. Tex. Mar. 4, 2022) ............................................. 11

*Tucson v. City of Seattle*,
    91 F.4th 1318 (9th Cir. 2024) .................................................................... 4

*U.S. Army Corps of Engineers v. Hawkes Co.*,
    578 U.S. 590 (2016) ................................................................................... 7

**Statutes**

5 U.S.C. § 702 ................................................................................................ 5

5 U.S.C. § 704 ............................................................................................. 6, 7

26 U.S.C. § 61 ........................................................................................ 3, 5, 14

26 U.S.C. § 139 ............................................................................................. 16

26 U.S.C. § 7421(a) .................................................................................. 10, 12

26 U.S.C. § 7422 ............................................................................................. 7

28 U.S.C. § 1346(a)(1) .................................................................................... 7

Anti-Injunction Act (26 U.S.C. § 7421) .................................................... 1, 12

Declaratory Judgment Act (28 U.S.C. § 2201) ............................................... 1

**Other Authorities**

CCA 200908025 ............................................................................................ 16

Rev. Rul. 57-102, 1957-1 C.B. 26 ................................................................. 15

Rev. Rul. 68-38, 1968-1 C.B. 446 ..................................................................... 15

Rev. Rul. 74-74, 1974-1 C.B. 18 ....................................................................... 15

Rev. Rul. 74-153, 1974-1 C.B. 20 ..................................................................... 15

Rev. Rul. 74-205, 1974-1 C.B. 21 ..................................................................... 15

Rev. Rul. 76-144, 1976-1 C.B. 17 ..................................................................... 16

Rev. Rul. 76-229, 1976-1 C.B. 19 ..................................................................... 16

Rev. Rul. 76-395, 1976-2 C.B. 16 ..................................................................... 16

Rev. Rul. 78-170, 1978-1 C.B. 24 ..................................................................... 16

Rev. Rul. 2005-46, 2005-2 C.B 120 ................................................................... 15

# I.    INTRODUCTION

Dismissal of this action is warranted. Arizona has presented the Court with nothing new. It has only emphasized the arguments it already made in its unsuccessful motion for preliminary injunction. But the problem with Arizona's case isn't one of emphasis, but a lack of jurisdiction and failure to state a claim. Now there can be no doubt that Arizona cannot establish standing, a waiver of sovereign immunity, or that its complaint cannot overcome the Anti-Injunction Act ("AIA") and the Declaratory Judgment Act ("DJA"). And even if the Court did have jurisdiction to hear the case, Arizona's complaint fails to state a claim upon which relief can be granted because the payments it made to its residents are includable in income. None of these defects can be cured by amendment. Indeed, Arizona does not even suggest as much. Arizona's opposition, full of cherry-picked facts and law, is insufficient to defeat the United States' meritorious motion to dismiss.

# II.    ARGUMENT

## A.    This Court lacks jurisdiction over Arizona's complaint.

### 1.    *Arizona cannot show it has standing.*

The Court already correctly concluded that Arizona's "alleged loss of transaction privilege taxes flows directly from the tax treatment of its taxpayers and is wholly derivative of its taxpayer's injuries." ECF No. 29 (Order) at 6:24-7:1. Nothing Arizona has argued rebuts this conclusion. Arizona fixates on whether its alleged loss is "more direct" than others and whether its alleged "sovereign injury is greater." ECF No. 40 (Opposition "Opp.") at 9-10. But Article III standing is not a contest of degrees. It is a three-pronged standard that requires Arizona to establish: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendant's challenged conduct, such that the injury is "fairly traceable to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Arizona has not met its burden. Instead, by Arizona's "basic economic

1

logic" (Opp. at 7:7-8) each year any state could manufacture standing to challenge any IRS position or new Internal Revenue Code provision passed by Congress that resulted in its residents paying higher taxes. This result would upend tax procedure and render Article III's injury requirement meaningless.

In opposing dismissal, Arizona argues that its alleged loss of $480,000 in sales tax revenue "is not 'conjectural' or 'hypothetical'; rather it is an estimate of specific lost tax revenue based on a calculation by an experienced Department of Revenue economist." Opp. at 6:15-16. But even with a supplemental declaration from Karen Jacobs (ECF No. 40-1), Arizona's alleged loss and injury is no less speculative or more direct. In explaining how she reached her $480,000 figure, Ms. Jacobs explains she used data from the IRS's Statistics of Income (no citation provided) "to determine the estimated federal average effective tax rate, or the percent of income that an individual would pay in federal taxes." *Id*. ¶ 4. She then applied those rates to the Arizona Tax Rebate amounts to determine the estimated federal tax on the rebate.[1] *Id*. ¶ 5. Those calculations resulted in her estimate that Arizona taxpayers had to remit about $20.8 million to the IRS. *Id.* ¶ 3. Ms. Jacobs then used the Washington, D.C. Burden Study (no citation provided) which she represents calculates an estimated sales tax burden for households at various income levels. Based on that study and her data on the 2021 average federal adjusted gross income of households that claimed the rebate ($87,000), she applied a 2.3% burden to her analysis. *Id.* ¶ 5. That calculation yields what she deems is the estimated loss of $480,000 in sales tax to Arizona. *Id.* ¶ 6.

This explanation of how she reached her estimate is appreciated; however, it does not cure any of the defects in the analysis. Now we know for sure that Arizona did not consider: whether Arizona taxpayers reported the payments as income, whether losses or credits offset any additional tax attributable to treatment of the payments as income, and whether the IRS will pursue any adjustments if taxpayers do not report the payments as

---

[1] For purposes of this argument the United States accepts without conceding that Ms. Jacobs properly included the correct payment amounts and number of recipients for each income bracket because none of that detail has been provided.

income. And beyond overlooking even those obvious additional factors that could impact its calculation, Arizona continues to assume that every dollar paid in federal tax is a dollar that would have otherwise been spent in its economy generating sales tax. But that is not "basic economic logic," it is fantasy.[2]

Arizona argues that its causal connection from its alleged sales tax loss and the IRS's suggested tax treatment is simple and direct, with just three steps. As alleged, (1) the IRS taxes[3] the payment, which (2) takes money from taxpayers in Arizona, "some of which they otherwise would have spent on goods and services"; which (3) results in a predictable and calculable loss of sales tax. Opp. at 18-21. But there are huge gaps in this causal chain. People travel and spend their money out of state. People save money. And what Ms. Jacobs has now confirmed is that Arizona's alleged loss was based on a calculation that piles unsubstantiated assumption on unsubstantiated assumption. The United States is not nitpicking when it describes Arizona's analysis as oversimplistic (Opp. at 6:21-22) but is instead pointing out that Arizona has failed to establish two of the three requirements for standing. Arizona's speculative estimate of lost sale tax revenue is not a concrete, direct injury. Arizona offers no indication that sales tax revenue in fact declined at all, nor that any change in sales tax revenue has to do with federal

---

[2] What is worse, however, is that it appears Arizona rebated a collective $867,000 to its lowest income bracket while handing out almost $22 million to its top income bracket. Any claim Arizona made payments in the general welfare or for disaster relief are belied by the fact that it doled out its budget surplus to the Arizonans that needed it the least.

[3] Throughout its Opposition, Arizona characterizes the IRS's tax treatment of the payments as unlawful (Opp. at 1:2,3, 4:16, 5:20, 6:12, 9:19, 10:23, 27, 12:8, 13, 16, 17, 18, 13:12, 16, 14:22, 16:23, 19:20, 21:25, 22:24, 23:10) and illegal (Opp. at 17:17, 18:25, 21:2, 23:10), and even seems to suggest that the IRS itself is imposing a specific tax on the rebate payments (Opp. at 9:19, 10:6, 12:8, 9, 13:24, 25, 21:22, 23:10). But what the IRS has done here is advise, in response to Arizona's asking it to, that it believes the proper federal tax treatment of the payment is that it is income. Because it is income, that amount should be reported by the taxpayer along with the rest of the income earned or received that year. And income, from whatever source it's derived, is and has long been taxable under the Internal Revenue Code. 26 U.S.C. § 61. Contrary to how it might read at times in the Opposition, the IRS has not (and cannot) imposed a specific and separate tax on the payments Arizona made to its taxpayers. Relatedly, in discussing *New York v. Yellen*, 15 F.4th 569, 575-77 (2d Cir. 2021), Arizona states, "the Second Circuit held that New York and other states had standing to sue the IRS for imposing a $10,000 cap on the state and local tax (SALT) deduction." Opp. at 9:6-7. The $10,000 SALT cap at issue was imposed by Congress, not the IRS.

3

taxation of state residents as opposed to myriad other factors that influence Arizonans' in-state spending. Thus, even if there were such an injury, Arizona does not show it is fairly traceable to the IRS's suggested tax treatment.

Not only can Arizona not establish a loss of sales tax revenue traceable to the IRS's conduct, it also cannot establish any injury redressable by the Court. Indeed, it didn't even try. "Redressability asks whether the district court had the power to prevent the injury at the time the complaint was filed." *Tucson v. City of Seattle*, 91 F.4th 1318, 1325 (9th Cir. 2024). Arizona's silence is a tacit admission that even if the IRS were to change its position and declare that it would not challenge exclusion of the payments from income, that does not guarantee the payment recipients will spend more money in Arizona. Arizona also argues that, had its payments qualified for either the general welfare or disaster relief exclusions, no Forms 1099 would have been necessary and that its alleged sovereign injury is that it had to issue Forms 1099 in support of an "unlawful determination." Opp. at 10 n.2. For purposes of standing, neither is redressable. By the time Arizona filed its complaint, it had made available the Forms 1099. ECF No. 18-1, Ex. 13. Even if those were injuries, the Court was powerless to prevent them.

Arizona has failed to allege a concrete and particularized injury-in-fact that is fairly traceable to the IRS and can be redressed by a favorable decision by the Court. Arizona has failed to establish standing, and its complaint should be dismissed.

### 2. *Arizona has also failed to establish a waiver of sovereign immunity.*

The United States can be sued only if it waives its sovereign immunity and that applies equally to its federal agencies and their employees, if acting in their official capacities. *Hodge v. Dalton*, 107 F.3d 705, 707 (9th Cir. 1997). Even so Arizona still fails to identify a waiver of sovereign immunity. Its citation to the Internal Revenue Manual's discussion of sovereign immunity, seemingly as authority in support of a waiver here, does not help. Opp. at 15:13-16. The Internal Revenue Manual is merely a set of internal guidelines that "does not have the force of law and does not confer rights on taxpayers."

*Fargo v. Comm'r*, 447 F.3d 706, 713 (9th Cir. 2006). It cannot support a waiver of the United States' sovereign immunity.

Yet in summary fashion Arizona states that 5 U.S.C. § 702 provides a broad and unqualified waiver for all non-monetary claims for relief against federal agencies. Opp. at 15:16-22. But as the United States explained in its motion to dismiss (ECF No. 32 at 8), the Ninth Circuit has read § 702 to provide a waiver for claims that do not arise under the APA and are non-monetary. *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1172 (9th Cir. 2012). To get around this, Arizona now disclaims seeking monetary relief. But its prayer for relief seeks to "[e]njoin the IRS from enforcing its unlawful determination *and to refund amounts that have been unlawfully collected*" (Complaint, Prayer for Relief at b) (emphasis added). Seeking an injunction that directs the IRS to issue refunds *is* seeking monetary relief.[4] Thus, § 702 does not waive the United States' sovereign immunity here. *King Mountain Tobacco Comp. Inc., v. Alcohol and Tobacco Tax and Trade Bureau*, No. CV-11-3038, 2012 WL 12951864, at *3 (E.D. Wash. Sept. 24, 2012).

Moreover, as explained in the United States' motion but not addressed by Arizona, it has expressly alleged two causes of action under 26 U.S.C. § 61, and two other causes of action read in substance as challenges to income determinations under § 61 (counts three and four). Section 61, however, does not provide a cause of action and certainly does not provide a waiver of sovereign immunity. *Cf. McMaster v. Coca-Cola Bottling Co. of California*, 392 F. Supp. 2d 1107, 1112 (N.D. Cal. 2005).

In a footnote, Arizona again attempts to recast its complaint, this time as to its allegations against Commissioner of Internal Revenue Daniel Werfel and the Secretary of the Treasury Janet Yellen. Opp. at 16, n.5. Although the complaint references Commissioner Werfel and Secretary Yellen in the caption and then identifies them as parties (in their official capacities); it contains no allegations at all regarding any specific actions by either. Complaint ¶¶ 12, 14. However now Arizona argues that they "exercised

---

[4] Arizona admits that only individual taxpayers can seek refunds. Opp. at 15:24-25. There can be no clearer admission that what it seeks to do by this action is impermissible—it is seeking refunds on behalf of its residents.

their powers in a constitutionally void manner" and attributes the alleged violation of Congress' Taxing Power to them. Opp. at 16, n.5. But the fact the IRS advised that it disagreed with the federal tax treatment Arizona wanted does not create a cause of action against its officials or mean that Commissioner Werfel and Secretary Yellen's actions were constitutionally void. *E.g.*, *Adams v. Johnson*, 355 F.3d 1179, 1184-1186 (9th Cir. 2004) (finding *Bivens* relief against IRS officials for claims related to federal tax assessment or collection unavailable due to comprehensive remedial scheme for tax-related disputes). If Arizona had specific allegations of actions taken by Commissioner Werfel and Secretary Yellen that demonstrate they violated the Constitution in some way unrelated to tax assessment or collection, it could have amended its complaint. But that would seemingly take this case into entirely new waters that haven't been alleged to date. And, in any event, Arizona cannot rewrite its complaint now through argument.

**3.**     *There is no relief available to Arizona under the APA.*

Arizona seeks relief under the APA, but the APA does not provide an avenue for relief, and sovereign immunity is not waived, if the decision under review is not made reviewable by statute and is not a "final agency action for which there is no other adequate remedy in a court...." 5 U.S.C. § 704; *Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998). Arizona argues that the February 15, 2024, letter from the IRS to Arizona Attorney General Kris Mayes is a final agency action. Opp. at 16-17. And while there is some facial appeal to calling the letter a final agency action, legally it fails to satisfy the test.

**Finality.** Two conditions must be satisfied for an agency action to be final: the action must mark the consummation of the agency's decision-making process and be one by which rights or obligations have been determined, or from which legal consequences will flow. *See Gallo*, 159 F.3d at 1198–99; *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (overruled on other grounds). The IRS advice here, even when conveyed under the signature of the Commissioner, is not a final agency action. That advice is just the IRS's

6

administrative position about the tax treatment of the payments Arizona made.[5] It does not determine anyone's final tax bill or any of Arizona's rights or obligations. It also has no legal consequence for the payment recipients, who may raise a challenge through the IRS examination process and administrative appeals process, and ultimately to a court.

The cases cited by Arizona do not contradict this conclusion. None of them involve a letter from the IRS or any other IRS communication of views on tax matters. Opp. At 17:6-9. Indeed, every year the IRS issues copious informal guidance that lacks binding legal effect, including (1) informal letters to states, taxpayers, and other constituents; (2) informational notices to taxpayers; (3) publications to educate tax practitioners and the public; and (4) FAQs, press releases, and other informal advice on the IRS website. *See Caterpillar Tractor Co. v. United States*, 589 F.2d 1040, 1043 (Ct. Cl. 1978) ("It is hornbook law that informal publications all the way up to revenue rulings are simply guides to taxpayers, and a taxpayer relies on them at his peril.").

**Alternative Remedy.** "Even if final, agency action is reviewable under the APA only if there are no adequate alternatives to APA review in court." *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 600 (2016); 5 U.S.C. § 704. The tax consequence of a taxpayer including (or not including) the amount of the payment received in income will be determined via their 2023 tax return and taxpayers may omit the payment and defend the omission in the Tax Court or report the payment and "bring an action against the Government either in United States district court or in the United States Court of Federal Claims," provided they "comply with the tax refund scheme established in the Code." *Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 4-5 (2008) (referencing 28 U.S.C. § 1346(a)(1), 26 U.S.C. § 7422, and the jurisdictional prerequisite for such a suit.). The IRS's administrative position is not a final agency action for which there is no adequate remedy because Arizona taxpayers can sue to challenge the IRS's position.

---

[5] In January 2024, Arizona made available Forms 1099 to its certain taxpayers who received the payments. This is an indication that Arizona already understood the IRS's position on the federal tax treatment of the payments before the February 15, 2024, letter.

4.      *The AIA and DJA indeed bar Arizona's complaint.*

a)      Arizona's arguments that the *Regan* exception applies fail.

In considering whether Arizona was likely to succeed on the merits of this action, this Court correctly concluded in denying the motion for a preliminary injunction, that binding Ninth Circuit precedent in *Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax & Trade Bureau*, 843 F.3d 810 (9th Cir. 2016) "is difficult to fairly distinguish from the facts here." Order at 6:10. Because Arizona doesn't like the result that conclusion requires, it argues that "the Court gave too much weight to a Ninth Circuit case applying *Regan* on disparate facts and too little weight to *Regan* itself." Opp. at 10:20-11:1. But this Court did not depart from *South Carolina v. Regan,* 465 U.S. 367 (1984), (and neither did the Ninth Circuit) in the *Yakama* analysis.

To make *Regan* seem more analogous to this case than *Yakama*, Arizona oversimplifies the facts and holding of *Regan*. First, Arizona argues that *Regan* addressed a state and not an Indian tribe. And because Arizona is a state, it asks for special treatment. Opp.at 11:21-23. But there is nothing in the AIA, *Regan*, or *Yakama* that even hints that states are entitled to special consideration under the AIA. They are not. *Yakama,* 843 F.3d at 813-14 (discussing *Regan*, the Supreme Court "did not question that South Carolina, acting as a sovereign, was a 'person'" under the AIA.). Arizona's suggestion that a state has a higher sovereign prerogative than an Indian tribe against the federal government has it backward. *E.g.*, *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (recognizing tribes as "separate sovereigns pre-existing the Constitution" and unless and until Congress acts, tribes retain their historic sovereign authority.) (cleaned up); *Pauma v. Nat'l Lab. Rels. Bd.,* 888 F.3d 1066, 1076-1078 (9th Cir. 2018) (noting that certain federal laws of general applicability do not apply to tribes and that only the federal government, not states or private parties, can override tribal sovereign immunity). If an Indian tribe in Arizona's position cannot overcome the AIA, as in *Yakama*, then there is no legal basis to suggest that a state can. *Yakama* concluded as much, stating that the AIA applies with "equal force" to states and tribes. *Yakama* 843

F.3d at 813. To the extent that Arizona is suggesting that states have a higher sovereign status relative to Tribes under the special solicitude for standing purposes recognized in *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007), at least one federal circuit has concluded that "tribes, like states, are afforded 'special solicitude in our standing analysis.'" *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 463 (2d Cir. 2013) (*citing Massachusetts v. EPA,* 549 U.S. at 520). Thus, *Massachusetts* does not provide any support for Arizona's incorrect contention that states receive "solicitude" in a manner that Indian tribes do not.

Second, Arizona argues that in *Regan* the federal government took no direct action against South Carolina. Opp. at 11:26-7. But that description is incomplete. In *Regan*, the Supreme Court considered a constitutional challenge to a statute that eliminated a federal tax exemption for interest on unregistered "bearer" bonds, restricting the exemption to bonds whose ownership was registered. 465 U.S. at 371. In attacking the statute, South Carolina asserted a sovereign interest in issuing bonds in a form of its choice—one that would not require *it* to pay more on the bonds themselves. *Id*. at 371-72. Even if Congress did not legislate to change policy in South Carolina, the result was a direct impact on what it would cost South Carolina to issue bonds and on its economic policy. Arizona cannot allege any similar affirmative obligation to spend state money because of the federal tax treatment and has not alleged that a taxpayer challenge to the inclusion of the payment amount in income is a possibility so remote that the tax treatment would remain unreviewed. *Cf. Regan*, 465 U.S. at 380-81. These were key elements of the Supreme Court's reasoning in *Regan.* Contrast that with here: Arizona made payments to certain Arizona taxpayers from its budget surplus to mitigate the impacts of inflation. ECF NO. 18-1, Ex. 8 § L(2). Nothing in the IRS's determination of the proper federal tax treatment of those payments to the taxpayers that received them affirmatively costs Arizona anything. Only individual Arizona taxpayers pay more, and that has never been sufficient for a state to circumvent the AIA on its citizens' behalf. And Arizona is still free to drain its coffers of its budget surplus as it sees fit at no additional cost to it.

Third, Arizona posits that the federal tax treatment implicates sovereign state policy. Opp. at 12:2-19. It alleges that, like South Carolina, it was left with only three choices because the taxpayers it made payments to might pay income tax on those amounts: "(1) do nothing, and watch state money get sucked into federal coffers; (2) change state policy (i.e., never return taxpayer money or do so under a different framework and hope that the result is different); or (3) to the extent Arizona wants to return X dollars to taxpayers, increase the rebate amount to compensate for unlawful federal taxation." *Id.* at 12:9-13. But greater context clarifies that Arizona is not limited to the three dire alternatives it proposes.

Arizona now portrays these payments as only worth making if they are federal income tax free. But the point of the payments, as expressed then by the legislature, was to provide relief to certain taxpayers with families to ease the effects of inflation. ECF No. 18-1, Ex. 8 § 3(L)(2). The tax-free nature of the payment was not a factor until this litigation. Instead, the legislature contemplated the payment amount could be taxable by the federal government. ECF No. 18-1, Ex. 8 § 3(I). And there is no reference in the legislation to recipients spending the payments in the state and generating sales tax revenues for the state coffers. ECF No. 18-1, Ex. 8. But even so, if a necessary feature of payments was that they not be includable in taxable income for federal tax purposes then Arizona could have designed the payments differently. It could have refunded state taxes paid. Or it could have offered them as non-refundable tax credits.

Fourth, Arizona argues the Ninth Circuit's interpretation of *Regan* and application of its analysis to the facts in *Yakama* is without "textual" support because the Ninth Circuit focused on the derivative nature of the Indian tribe's injury. Opp. at 12:25-13:7. Arizona misunderstands the purpose of the "narrow *Regan* exception to the AIA. It is not to provide any plaintiff who may claim to be aggrieved an avenue to file a suit to restrain the assessment and collection of tax. 26 U.S.C. § 7421(a). Rather, it is to ensure that judicial review is available. Here, as in *Yakama*, because the actual tax impact (if there is any) is borne not by Arizona (or the tribe) but by individual taxpayers who

1   received a payment, and they have an alternative avenue to challenge the imposition of

2   any income tax, the narrow *Regan* exception to the AIA does not apply.

3         Fifth, Arizona argues that its equal sovereignty claim cannot be raised by

4   taxpayers, so its claims are not derivative. Opp. at 13:9-18. Arizona's equal sovereignty

5   claim appears to be based on the IRS's tax treatment of its 2023 payments as includable

6   in income when other states made payments in 2022 that were not required to be included

7   in income. As a threshold matter, it is not clear that a state can make an "equal

8   sovereignty" claim based on administrative, rather than legislative, action. Arizona's

9   citations to *NW. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193 (2009) and

10  *Texas v. Yellen*, 2022 WL 989733 (N.D. Tex. Mar. 4, 2022) do not support holding

11  otherwise. Opp. at 23:1-3. Each of those cases focused on a statute that it found

12  "differentiates between the States." *NW. Austin*, 557 U.S. at 203. But this case is about

13  longstanding federal tax statutes of general applicability—chiefly, the definition of

14  income—not any statute that "differentiates between the States." This court should

15  decline Arizona's invitation to dramatically extend "equal sovereignty" principles.

16        Furthermore, the suggestion that the IRS singled Arizona out and then reverse-

17  engineered a way to deny them the federal tax treatment it preferred their taxpayers

18  receive (Opp. at 23:20-23) is reckless and was not pled in the complaint. The IRS is not

19  discriminating against Arizona and is not subjecting its residents to discriminatory

20  taxation. The State of Minnesota made payments to its residents in 2023 like those made

21  by Arizona and the IRS has taken the same position—they do not qualify for the general

22  welfare or disaster relief exclusions and should be included in income. commissioner-

23  werfel-letter-to-stauber.pdf (house.gov) [https://perma.cc/NNY3-BDPY]. And the special

24  payments made by the 21 states in 2022 were not all afforded the same tax treatment—

25  four state payments were considered refunds of state taxes paid and the other 17 qualified

26  for either the general welfare or disaster relief exclusions. ECF No. 18-1, Ex. 1.

27  Arizona's equal sovereignty is about making payments to certain of its residents as it sees

28  fit. It is not about guaranteeing them certain federal tax treatment come April 15.

11

Sixth, Arizona points out that in *Yakama* the plaintiffs "admitted and demonstrated" that the relief sought was the same because the case as initially filed included as plaintiffs the Indian tribe, the cigarette manufacturer, and its owner (also a tribe member) while here it is the only plaintiff. This is not persuasive. Opp. at 13:27-14:2. Just because it has not admitted that the claims it advances belong to its taxpayers who received payments does not mean this Court cannot look at the substance of its claims and make that determination. Indeed, it already properly did. Order at 6:24-7:1.

Finally, Arizona states that if the Court were to dismiss this action it would be the first to dismiss a suit based on the AIA and brought by a state. Opp at 14:16-17. Once more, the AIA applies to actions with the purpose of restraining the assessment and collection of tax without even identifying who may bring them. 26 U.S.C. § 7421(a). If Congress had meant for the AIA to not apply to certain litigants, such as the states, it would have said so. The lack of cases in which a court dismisses a state's complaint based on the AIA is likely more a reflection that states have not sought to bring suits on their residents' behalf. Arizona's repeated requests for special treatment are another tacit admission dismissal is appropriate here.

Simply put, this Court was correct in concluding that the binding Ninth Circuit precedent in *Yakama* "is difficult to fairly distinguish from the facts here." Order at 6:10. The Ninth Circuit did not depart from *Regan* in its analysis of *Yakama*, and *Regan* does not stand for the principle that a state can sue anytime its residents' federal taxes increase. Sanctioning an AIA workaround in these circumstances would be anything but narrow and open the floodgates to state-sponsored tax suits on their residents' behalf. Because Arizona seeks to restrain "the assessment or collection of [a] tax" by seeking to "[e]njoin the IRS from enforcing its unlawful determination and to refund amounts that have been unlawfully collected" (Complaint, Prayer for Relief at b), its complaint falls squarely within the AIA and DJA's prohibitions[6] and it should be dismissed.

---

[6] Because the AIA bars Arizona's claims, the Court need not determine whether the DJA's tax exception applies. *Yakama*, 843 F.3d at 816 n.1; *see also Perlowin v. Sassi*,

b) The *Williams Packing* exception likewise does not apply.

Arizona argues that because it believes it will prevail on whether the payment should be includable in its certain taxpayers' income that the other "narrow" exception to the AIA explained in *Enochs v. William Packing & Navigation Co.*, 370 U.S. 1 (1962), should apply. But for that narrow exception to apply Arizona must show that under *no* circumstances could the United States ultimately prevail on the merits of the case. *Id.* at 6-8; *Elias v. Connett*, 908 F.2d 521, 525 (9th Cir. 1990). That it cannot do. This Court has already correctly concluded "it is unlikely that it has jurisdiction to hear this particular claim." Order at 7:4-5. And the likelihood of the United States' success on the jurisdictional question cannot be divorced in the *Williams Packing* analysis from whether the payments should be considered in income. (And even on that substantive tax question, the United States' motion to dismiss explains why the IRS's analysis was correct, or, at a bare minimum, reasonable.) Because Arizona has failed to establish jurisdiction, the *Williams Packing* exception does not apply.

**B.    Arizona fails to state a claim.**

    *1.    Arizona's payments are not refunds of state taxes paid.*

Rather than engage with the lengthy discussion of *Maines v. Comm'r*, 144 T.C. 123 (2015), in the United States' motion to dismiss (ECF No. 32 at 14-17), Arizona persists in misreading and overextending that decision. It continues to incorrectly equate credits, refunds, and rebates and misstates the holding of the case. Arizona cites *Maines* as plainly holding "that only the '*excess portion*' of a tax refund 'that remains after first reducing state-tax liability . . . is an accession to the [taxpayer's] wealth, and [includible] in . . . federal gross income." Opp. at 18:5-8 (emphasis in original). But the complete quotation of the holding in *Maines* makes clear that it is not referring to the excess portion of a tax *refund*. Instead, *Maines* found "with refundable portions of tax credits, taxpayers may receive cash payments in *excess* of their tax liability. We therefore hold that this excess portion that remains after first reducing state-tax liability and that may be

711 F.2d 910, 911 (9th Cir. 1983) (AIA and DJA are coextensive in their limitations); *Frank Lloyd Wright Found. v. Kroeter,* 697 F. Supp. 2d 1118, 1137 (D. Ariz. 2010).

refunded is an accession to the Maineses' wealth and must be included in their federal gross income under section 61." 144 T.C. at 135-36 (emphasis in original). *Maines* dealt exclusively with refundable tax *credits* that first had to be applied to current year liabilities, not unrestricted payments made by a state to its taxpayers. *Maines* does not support Arizona's position that its payments must be treated as refunds or credits that could be excluded from income.

Maybe in recognition of this legal reality, Arizona focuses on the Court's remarks during oral argument on its motion for preliminary injunction. Opp. at 14, n.3, 18:9-12, 20-24. But those comments came before the Court heard from counsel for the United States (4/24/2024 Tr. At 17:15-16), before the Court had the benefit of the United States' full analysis of *Maines* (ECF No. 32 at 14-17) and cannot rescue a case that otherwise violates the AIA and DJA.

Contrary to what Arizona repeatedly declares, the IRS has not "illegally taxed noninfcome." Opp. at 17:17. To be a refund of state taxes paid, a state tax refund must be limited to taxes previously paid. Arizona's payments are not refunds of taxes paid not because they are not "facially limited to taxes actually paid" but because they are not actually limited to taxes paid. Opp. at 18:4. The defect is not on the face of the payment but in the nature of the payment itself. This defect is also not one that can be cured by amendment or argument. Arizona designed its program to give a set amount of money to taxpayers to spend as they wished. Though Arizona determined who would get what in part based on tax attributes, the payments themselves were fundamentally different from the credits that the *Maines* court treated as refunds, which had to first be applied to offset tax liability (and one of which was limited to tax previously paid). The Court should reject Arizona's attempt to paint with a single brushstroke all state payments and credits with any tie to tax attributes—this is neither what the law requires nor what *Maines* held.

       2.     *Arizona's payments do not qualify for the general welfare exclusion.*

Arizona argues that is has suffered discriminatory treatment because the IRS determined the payments it made in 2023 did not qualify for the general welfare

exclusion and that it did so based on no criteria. Opp. at 19:6-11. Even worse, Arizona argues, the IRS did so ignoring the guidance it issued three months before Arizona's legislation was enacted. *Id.* But what Arizona portrays as binding criteria for the general welfare exclusion was just one IRS press release[7] announcing that, of 21 states that made payments to their residents in 2022 (during the COVID-19 pandemic), taxpayers in 17 states would qualify for either the general welfare or disaster relief exclusions. ECF No. 18-1, Ex. 1. In the same press release, the IRS also made clear that its treatment only applied to the 21 states and only for the 2022 payments. *Id.* Despite Arizona's portrayal, this press release articulates no criteria for applying the general welfare exclusion.

Arizona argues the IRS did not provide any specific criteria for what qualifies for the general welfare exclusion, but for nearly 100 years (excepting 2022) the IRS has consistently only allowed certain payments: (1) made from a governmental fund; (2) for the promotion of the general welfare (i.e., based on individual or family need rather than to all residents regardless of financial status, health, educational background, or employment status); and (3) not for services that the recipient provides, to qualify. *See* Rev. Rul. 2005-46, 2005-2 C.B 120; Notice 2023-56; *see, e.g.*, Rev. Rul. 57-102, 1957-1 C.B. 26 (state payments to blind persons); Rev. Rul. 68-38, 1968-1 C.B. 446 (job-training program payments to individuals to enhance employability); Rev. Rul. 74-74, 1974-1 C.B. 18 (state payments to crime victims); Rev. Rul. 74-153, 1974-1 C.B. 20 (state payments to adoptive parents for care of their adoptive child); Rev. Rul. 74-205, 1974-1

---

[7] Arizona states the IRS has "promised" it will "'not take positions inconsistent with its subregulatory guidance when such guidance is in effect.'" Opp. at 21:7-11. Yet the "guidance" Arizona has based its case on is a press release that by its own terms was limited to 2022. ECF No. 18-1, Ex. 1. This is why, even though the United States is not asking the Court to determine whether Arizona reasonably relied on prior guidance, such "reliance" cannot by itself create an injury. To survive a motion to dismiss Arizona must show some actual direct injury which they cannot do for all the reasons discussed. Furthermore, a press release is not subregulatory guidance as defined by the very policy statement Arizona cites. https://home.treasury.gov/system/files/131/2019-Policy-Statement-on-the-Tax-Regulatory-Process.pdf [https://perma.cc/K3HF-GATY] ("For purposes of this policy statement, 'subregulatory guidance' means subregulatory guidance published in the Internal Revenue Bulletin. The following types of subregulatory guidance are published in the Internal Revenue Bulletin: revenue rulings, revenue procedures, notices, and announcements.").

C.B. 21 (replacement housing payments); Rev. Rul. 76-229, 1976-1 C.B. 19 (payments to workers who became unemployed because of impacts on their employers due to changes in trade policy); Rev. Rul. 76-144, 1976-1 C.B. 17 (disaster payments for expenses or to meet needs including medical, dental, housing, personal property, transportation, and funeral expenses); and Rev. Rul. 78-170, 1978-1 C.B. 24 (state credits to offset the cost of winter energy consumption). The IRS has further limited the general welfare exclusion to government programs that make payments to low-income individuals or families. *See, e.g.*, Rev. Rul. 78-170, 1978-1 C.B. 24 (payments made by the State of Ohio to lower-income, elderly individuals to reduce their cost of winter energy consumption); Rev. Rul. 76-395, 1976-2 C.B. 16 (home rehabilitation grants to low-income families to correct substandard conditions); CCA 200908025 (payments to low-income households for energy efficient furnaces and boilers).

The 2023 Arizona payments do not qualify for the general welfare exclusion because the income limitations for the payments are above what is generally considered to be covered by the general welfare exclusion and Arizona residents that had no tax liability in 2019-2021 were not eligible to receive a payment. Indeed, the chart in the declaration submitted with Arizona's opposition reveals just how regressive its program was. ECF No. 40-1 at ¶ 4. Arizona fails to address these flaws and instead keeps complaining of discrimination based on what the IRS allowed in 2022. But because Arizona decided its payments would not be based on need, Arizona's payments cannot qualify for the general welfare exclusion.

            3.      *Arizona's payments do not qualify as disaster relief.*

Payments made by a state to its citizens "in connection with" a "qualified disaster" that are made to "promote the general welfare" may be excluded by a taxpayer from their gross income. 26 U.S.C. § 139. Arizona's payments were not *made* in connection with a qualified disaster to promote the general welfare. The operative word in this analysis is *made*. Making the relevant inquiry: when the payments were made why were they made and to whom? The legislation reveals the reason the payments were made—because

Arizona had a budget surplus and inflation. ECF No. 18-1, Ex. 8. Neither a budget surplus nor inflation are qualified disasters under § 139(c). As to whom was paid?  Not the state's poorest residents. Excluding the state's poorest residents from payments during a disaster does not "promote the general welfare." Arizona tries to rewrite events to save its case, but the legislature made clear when it acted that the payments were not being made in connection with any qualified disaster to promote the general welfare.

4.    *Arizona fails to state statutory and constitutional claims.*

Arizona has expressly alleged two causes of action under § 61. Its two other causes of action allege violations of Congress' Taxing Power and Arizona's equal sovereignty, but the allegations for both read in substance as challenges to income determinations under § 61. Arizona's final count alleges an APA violation. None states a claim for relief.

Section 61 defines gross income. It does not provide a cause of action. *Cf. McMaster v. Coca-Cola Bottling Co. of California*, 392 F. Supp. 2d 1107, 1112 (N.D. Cal. 2005). Accordingly, four of the counts Arizona has alleged in its complaint fail to state a claim upon which relief can be granted. Arizona may argue its final count can be distinguished as alleging a separate violation of its equal sovereignty—that it is being discriminated against by the IRS because its certain taxpayers were denied the federal tax treatment it would have preferred they receive. Opp. at 23. But as explained (*supra* p. 11), Arizona fails to set forth a basis for an equal sovereignty claim via an agency's interpretation of a statute of general applicability to all Americans. Such an interpretation of the "equal sovereignty" case law Arizona cites would open a Pandora's box of claims by states. Plus, there is already a specific remedial scheme for agency action: the APA.

And Arizona's fourth count under the APA fails to state a claim because there was no final agency action (*supra* p. 6-7). But even if the Court did consider the IRS's administrative position as expressed in the February 15, 2024, letter a final agency action, it was not arbitrary and capricious and cannot be set aside. An agency decision that is rational, based on consideration of the relevant factors, and within the scope of the

17

authority delegated to the agency cannot be set aside as arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 42 (1983). The IRS's administrative position, that the Arizona payments do not qualify as refunds (*supra* p. 13-14) or for the general welfare (*supra* p. 14-15) or disaster relief (*supra* p. 16-17) exclusions, is based on the IRS's rational and reasoned analysis and is not arbitrary or capricious.

### III.   CONCLUSION

Even though the IRS's administrative position is not what Arizona wanted it to be, what the IRS did here and does is good; it provides guidance to U.S. taxpayers as efficiently as it can. That ought not be discouraged.

When Arizona told the IRS it made payments to some of its taxpayers, and asked the IRS how it thought those payments should be treated by the taxpayers on their returns, the IRS responded that those payments did not qualify as refunds of state income taxes or for the general welfare or disaster relief exclusions and should be included in income. Would Arizona have preferred that the IRS not respond? Play a game of hide-the-ball with the state and its taxpayers? Politely decline to give any guidance and instead say it was up to each taxpayer acting alone to determine the federal tax treatment of the Arizona payment? It is unlikely that Arizona, or any other state or individual taxpayer would prefer the IRS's silence. So the state asked the IRS for its advice on the likely federal tax treatment of the payments and the IRS gave its reasoned answer and because the state did not like the answer, we are here. But Arizona's dissatisfaction is not actionable, and its complaint should be dismissed with prejudice.

DATED this 13th of June, 2024

DAVID A. HUBBERT
Deputy Assistant Attorney General

*/s/ Amy Matchison*
AMY MATCHISON
Trial Attorney, Tax Division
U.S. Department of Justice

18